IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

MICHAEL DEWAYNE SMITH,     )
                               )
       Petitioner,         )
                               )
vs.                           )    Case No. CIV-09-293-D
                               )
ANITA TRAMMELL, Warden,     )
   Oklahoma State Penitentiary,    )
                               )
       Respondent.[1]     )

## MEMORANDUM OPINION

Petitioner, Michael DeWayne Smith, a state court prisoner, has filed a Petition for a Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 28. Petitioner, who is represented by counsel, is challenging the convictions entered against him in Oklahoma County District Court Case No. CF-2002-1329. Tried by a jury in August and September of 2003, Petitioner was found guilty of Burglary in the First Degree (Count 1), Murder in the First Degree (Counts 2 and 3), Robbery With Firearms (Count 4), and Arson in the First Degree (Count 5). On Counts 1, 4, and 5, Petitioner received an aggregate sentence of 85 years and a $25,000 fine. On Counts 2 and 3, the jury found that Petitioner was a continuing threat and that the murders were especially heinous, atrocious, or cruel, and Petitioner was sentenced to death on each count (J. Tr. 12, 91; J. Tr. 17, 68-69, 84-85).

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Anita Trammell, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party Respondent in this case.

Petitioner has presented ten grounds for relief. Doc. 28. Respondent has responded to the Petition and Petitioner has replied. Docs. 51 and 58. In addition to his Petition, Petitioner sought leave to conduct discovery relating to his Ground One. Doc. 29. The Court denied this request. Doc. 63. Petitioner has also requested an evidentiary hearing. Although Petitioner's primary contention is that his Grounds One through Four are matters of law that warrant relief without a hearing, Petitioner makes an alternative request for an evidentiary hearing on those grounds. Doc. 35. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed herein, and the applicable law, the Court finds that an evidentiary hearing is unwarranted[2] and that Petitioner is not entitled to the requested relief.

## I. Procedural History.

In Case No. D-2003-1120, Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). In a published opinion, Smith v. State, 157 P.3d 1155 (Okla. Crim. App. 2007), the OCCA affirmed. Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on February 19, 2008. Smith v. Oklahoma, 552 U.S. 1191 (2008). Petitioner also filed two post-conviction applications, both of which the OCCA

---

[2] "The purpose of an evidentiary hearing is to resolve conflicting evidence." Anderson v. Att'y Gen. of Kansas, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859. Such is the case here.

denied. Smith v. State, 245 P.3d 1233 (Okla. Crim. App. 2010); Smith v. State, No. PCD-2005-142 (Okla. Crim. App. Feb. 24, 2009) (unpublished).

## II. Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the presented evidence. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> [Petitioner] was a member of the Oak Grove Posse, a subset of the Crips gang in Oklahoma City. On November 8, 2000, three members of the Oak Grove Posse attempted to rob Tran's Food Mart in south Oklahoma City. The three robbers were Teron "T–Nok" Armstrong, Kenneth "Peanut" Kinchion, and Dewayne "Pudgy–O" Shirley. During the course of the robbery attempt, the owner of the store shot and killed Armstrong. Kinchion and Shirley were eventually arrested. [Petitioner] was not involved in the attempted robbery but had close personal ties to Armstrong.

> On Friday, February 22, 2002, two days before the trial of Kinchion and Shirley was scheduled to start, [Petitioner] left his apartment in the Del Mar Apartments in Oklahoma City early in the morning. His roommate, Marcus Berry (also known as Marcus Compton), saw [Petitioner] take a .357 caliber revolver with him. [Petitioner] went first to Janet Moore's apartment looking for her son Phillip Zachary who he believed was a police informant. [Petitioner] had earlier told Berry that "snitches need to be dead."

> The evidence supports the conclusion that [Petitioner] arrived at Moore's apartment sometime before 6:30 a.m. Shoe prints indicated that [Petitioner] kicked in her front door and then her bedroom door. Moore began screaming, and, at approximately 6:30 a.m., a downstairs neighbor heard arguing between a man and a woman and then a single "pop" followed by footsteps.

Later that morning around 7:30 a.m. [Petitioner] arrived at A–Z Mart, a convenience store approximately fifteen miles from the Del Mar Apartments. A–Z Mart was immediately next door to Tran's Food Mart, the site of the earlier robbery attempt where Armstrong had been killed. The clerk on duty that morning at A–Z Mart was Sarath "Babu" Pulluru. Pulluru was filling in for the store owner who was taking the day off. [Petitioner] told detectives that he emptied two pistols into Pulluru, took some money, and used bottles of Ronsonol lighter fluid to start fires in the store. [Petitioner] said he set fire to the cash register, Pulluru's body, and a back room in order to destroy evidence. Shoeprints at the scene tracked Pulluru's blood from the cash register area, where his body was found, down the aisle to where the Ronsonol lighter fluid was displayed for sale. The bloody shoe prints at the A–Z Mart were similar to the shoe prints found at Moore's apartment.

At 1:00 or 2:00 a.m. the next morning, [Petitioner] returned to his apartment and told Berry that he had killed Janet Moore. He also told Berry that he had done something else to "take care of business," that he had avenged his family.

At 3:00 or 4:00 a.m., [Petitioner] went to Sheena Johnson's apartment and told her that he had killed two people that day. During that conversation, [Petitioner] told her that he had killed Phillip Zachary's aunt because Zachary had been "snitching." Johnson had already learned of Moore's murder and told [Petitioner] that the victim was Zachary's mother, not his aunt. In response, [Petitioner] shrugged his shoulders, and said "oh well." [Petitioner] showed Johnson how he held his gun when he shot Moore and went on to say that he had also killed a person at a "chink" store. During his description of the second homicide, [Petitioner] mentioned something about one of his fellow gang members having his head blown off during a robbery. He said he would kill anyone who crossed his family. [Petitioner] also mentioned that someone had been on television "dissing" his set in regard to that robbery. Subsequently, Johnson contacted CrimeStoppers and reported the conversation. When she made that report, [Petitioner] was already in police custody on a different matter.

Three days after [Petitioner] was detained, detectives interviewed him. [Petitioner] was given *Miranda* warnings, waived them, and agreed to talk. During the interview, [Petitioner] first denied committing the murders, then admitted only to being present, and finally admitted committing both murders. He explained he killed both victims in retaliation for wrongs done him or his family. He told detectives he went to Moore's apartment looking for her son,

that Moore panicked and started screaming, so he had to kill her. He said he killed Pulluru in retaliation against the store owner who shot Armstrong and in retaliation for disrespectful comments about Armstrong in the press attributed to someone from the A–Z Mart Mart [sic]. According to [Petitioner], as he fired off the initial barrage of bullets, Pulluru asked "what did I do?" [Petitioner] told him: "[M]y mother-f* * * * * * little homey, my people on the set, like, bam, bam, before he died I let him know, like this is for my little homey that's dead. Bam, bam, bam." [Petitioner] also told detectives that he had disposed of the clothes he had worn during the murders, that he had wiped down Moore's apartment to eliminate fingerprints, and that he set fire to whatever he had touched in the A–Z Mart to destroy evidence.

Smith, 157 P.3d at 1160-62. Particular facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

### III. Standard of Review.

### A.    Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.     Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

**C.     Merits.**

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's authority to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively

unreasonable." <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S. Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Id.</u> The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> (citation omitted).

# IV. Analysis.

## A.    Ground One:        Exculpatory Evidence.

In his first ground for relief, Petitioner asserts that the State withheld exculpatory evidence regarding two of the State's witnesses, Sheena Johnson and Marcus Berry. In affidavits obtained by habeas counsel over six years after Petitioner's trial, both Ms. Johnson and Mr. Berry make averments which call into question the validity of their testimony.[3] From these affidavits, Petitioner makes four claims for relief. In his first and second claims, Petitioner contends that he is entitled to relief due to the prosecution's failure to disclose this evidence and/or correct the witnesses' perjured testimony. Petitioner additionally claims that he was denied the right to an impartial judge and that his trial counsel was ineffective. Petitioner raised these claims in his second post-conviction proceeding which was initiated the same day he filed his Petition. The OCCA did not address the merits of the presented claims, but applied procedural bars. Smith, 245 P.3d at 1238. The parties dispute whether the applied procedural bars should be respected and enforced by this Court.

The OCCA addressed Petitioner's claims as follows:

> [Petitioner] claims his convictions and sentences are unreliable and violate his rights to due process and a fair trial. [Petitioner] contends that recently executed affidavits by trial witnesses Marcus Berry and Sheena Johnson demonstrate that: (1) the State withheld exculpatory evidence; (2) the trial judge was biased; and (3) the State failed to correct perjured testimony.

---

[3] An affidavit from Ms. Johnson's attorney was also obtained. Although Petitioner made little mention of it in his second post-conviction application, it was, contrary to Respondent's assertion, provided to the OCCA. See Second Application for Post-Conviction Relief, Case No. PCD-2010-150, p. 24 n.8.

In their affidavits, Berry and Johnson recant portions of their trial testimony and claim that they testified falsely because they were threatened and coerced by police and the trial judge. [Petitioner] contends that the evidence of coercion and threats against these two witnesses was in the possession of the police and prosecutors and that this information was exculpatory because it would have shown that Johnson and Berry's testimony was not credible.

Sheena Johnson's affidavit is dated December 9, 2009. In the affidavit, Johnson alleges that: (1) her children were taken away from her by the trial judge to force her to testify against [Petitioner]; and (2) she testified falsely about certain statements [Petitioner] made to her about the Pulluru murder and that she did so using information police told her to include in her testimony. Johnson's allegation about her children being taken from her as coercion was known at the time of [Petitioner's] 2003 trial. It was discussed between [Petitioner's] trial attorney, the judge, and the prosecutor, in response to the prosecutor's objection to [Petitioner's] cross-examination of Johnson, in which defense counsel inquired into Johnson's reasons for testifying.[FN7] Johnson's fear about losing her children was also known at the time of [Petitioner's] preliminary hearing in 2002, when she stated her belief that if she did not testify "I would have got arrested and my—I have a three-month-old baby and he would have—child welfare would have got him" (P.H. 54). Obviously, Johnson's fear of having her children taken away from her as retribution for not testifying was information that was known at the time of [Petitioner's] trial and could have been used to raise this issue on direct appeal or in [Petitioner's] first application for post-conviction relief. This information cannot serve as the factual basis for a second application for post-conviction relief. 22 O.S. Supp.2006, § 1089(D)(8).

FN7. See Tr. Vol. 8 at 84–86.

Additionally, the single piece of new information contained in Johnson's affidavit (i.e., that she lied about [Petitioner's] statements concerning the Pulluru murder under police direction) was certainly available at the time the affidavit was executed on December 9, 2009, if not earlier. Under our rules, a second application for post-conviction relief must be filed within sixty days from the date a previously unavailable factual basis for an application is discovered. Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App (2010). Based on the date of the affidavit, the factual basis for this claim was known for at least 132 days before the instant application was filed. Thus this aspect of [Petitioner's] claim is also procedurally barred.

Marcus Berry's affidavit is dated January 11, 2010. In the affidavit, Berry alleges that he testified falsely on a number of points at [Petitioner's] trial. Again, under our rules, a second application for post-conviction relief must be filed within sixty days from the date a previously unavailable factual basis for an application is discovered. Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App (2010). Based on the date of the affidavit, the factual basis for this claim was known for at least 99 days before the instant application was filed. This aspect of [Petitioner's] claim is procedurally barred.

Smith, 245 P.3d at 1238.

As set forth in its opinion, the OCCA declined to reach the merits of Petitioner's claims based on two separate and distinct procedural rules. The first was applied to Ms. Johnson's allegations that she was forced to testify at trial in order to get her children back.[4] The OCCA found that these circumstances were borne out by the district court record, and in fact, they were. When Ms. Johnson testified at the preliminary hearing, she stated that she came to court "[b]ecause if [she] didn't, [she] would have gotten arrested . . . ." Ms. Johnson explained that she had a three-month-old son and if she got arrested, "child welfare would have got him" (P.H. Tr. 8/9/02, 54). On cross-examination, Ms. Johnson testified that when she was served with the subpoena, police detectives told her that she could get arrested if she failed to show up. However, she declined to adopt defense counsel's suggestion that she had been threatened by the police. Ms. Johnson testified that she was the one who was thinking about the consequences for her son if she failed to comply with the

---

[4] Although the OCCA did not specifically address the additional affidavit submitted by Ms. Johnson's attorney, it logically falls within the OCCA's analysis here because the statements made therein relate to Ms. Johnson's allegations regarding her children. Presumably, the OCCA did not reference this additional affidavit in its analysis because Petitioner himself made only scant reference to the same in his application. See fn.3, supra.

subpoena (P.H. Tr. 8/9/02, 83-84). When Ms. Johnson testified at trial, she openly admitted that she did not want to be there, but that she knew she would get in trouble if she ignored the subpoena (J. Tr. 8, 26). On cross-examination, defense counsel explored Ms. Johnson's concerns that if she did not testify, her children[5] might be taken away. Although defense counsel was not allowed to explore the matter further in front of the jury, a transcribed bench conference shows that defense counsel was fully aware that Ms. Johnson did not have custody of her children when she testified (J. Tr. 8, 84-85).[6] Applying Okla. Stat. tit. 22, § 1089 (D)(8), the OCCA declined to address Petitioner's claims arising from these facts because it is clear that any claims related thereto could have been presented on direct appeal or in Petitioner's original post-conviction application. The Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not. See Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006); Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000); Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999); Moore v. Reynolds, 153 F.3d 1086, 1096-97 (10th Cir. 1998).

---

[5] By the time of trial, Ms. Johnson had two children (J. Tr. 8, 85).

[6] Petitioner has provided an affidavit from one of his trial attorneys, L. Wayne Woodyard, in which Mr. Woodyard states that "[a]t the time of [Ms. Johnson's] testimony, [he] did not know that [her] children were in DHS custody." Petition Attachment 27, p. 1. Whether or not Mr. Woodyard had actual knowledge of this fact is irrelevant because the record is abundantly clear that Petitioner's other attorney, Silas R. Lyman, had such knowledge (J. Tr. 8, 85) ("It goes to bias. It's why she's here, why she's saying that they've threatened her twice, once at the preliminary hearing, and now and, *in fact, it's come to pass*.") (emphasis added).

When a state court applies a state procedural rule to preclude merits consideration of a claim, a federal habeas court will follow suit if the rule is one which "is independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729. Whether a state-applied procedural bar is adequate and independent is a federal question. Id. at 736 ("federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds").

Generally, the matter of adequacy presents the tougher question. English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998). Whereas the issue of independence asks only whether the state court decision rested on state law, as opposed to federal law, the adequacy inquiry requires the habeas court to determine whether the applicable state procedural rule "is firmly established and regularly followed." Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008). In Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), the Tenth Circuit acknowledged that assessing whether a state procedural-default rule is regularly and consistently applied requires a court to determine "'whether the [state] courts' actual application of the particular procedural default rule to all similar claims has been evenhanded in the vast majority of cases.'" Spears, 343 F.3d at 1254 (citing Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995)). "[T]he fact that a state court has overlooked the procedural bar as an 'occasional act of grace' is insufficient to conclude that the procedural bar is inadequate." Cannon v. Gibson, 259 F.3d 1253, 1268 (10th Cir. 2001) (citing Andrews v. Deland, 943 F.2d 1162, 1190 (10th Cir. 1991)). See Beard v. Kindler, 558 U.S. 53 (2009) (concluding that even a discretionary state procedural rule can be adequate).

Petitioner asserts, however, that this Court should not recognize the OCCA's application of Section 1089(D)(8) because it is neither adequate nor independent. Petitioner cites <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), and <u>Valdez v. State</u>, 46 P.3d 703 (Okla. Crim. App. 2002), in support of his argument. Petition, p. 97. However, recent cases from the Tenth Circuit expressly reject Petitioner's argument. In <u>Black v. Workman</u>, 682 F.3d 880, 914-19 (10th Cir. 2012), and <u>Black v. Tramwell [sic]</u>, 485 F. App'x 335 (10th Cir. 2012) (unpublished), <u>cert. denied</u>, ___ U.S. ___, 134 S. Ct. 73 (2013), the Tenth Circuit found that, despite <u>Valdez</u> and the cases applying it, the OCCA's procedural bar to claims presented in a subsequent post-conviction application is both adequate and independent. In addition to <u>Black</u>, two additional cases, <u>Banks v. Workman</u>, 692 F.3d 1133, 1144-47 (10th Cir. 2012), <u>cert. denied</u>, ___ U.S. ___, 133 S. Ct. 2397 (2013), and <u>Thacker v. Workman</u>, 678 F.3d 820, 834-36 (10th Cir. 2012), reached similar conclusions. <u>See also Spears</u>, 343 F.3d at 1254-55. In light of this authority, Petitioner's argument fails.

Because the OCCA's application of Section 1089(D)(8) is both adequate and independent, the Court cannot consider the merits of the claims arising from Ms. Johnson's allegations that she was forced to testify at trial in order to get her children back unless Petitioner can satisfy an exception. A petitioner may overcome the application of a procedural bar if he can show either cause and prejudice or a fundamental miscarriage of justice. Petitioner argues both exceptions.

The first exception, cause and prejudice, requires Petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural

rule in question. <u>Spears</u>, 343 F.3d at 1255. Petitioner must also show that the failure resulted in actual prejudice. <u>Thornburg v. Mullin</u>, 422 F.3d 1113, 1141 (10th Cir. 2005). Here Petitioner asserts that his post-conviction counsel was ineffective. Petitioner contends that he can rely on the ineffectiveness of his counsel in his first post-conviction application as cause because one of his trial attorneys, Mr. Woodyard, represented him at trial and on appeal. Petition, pp. 97-98; Reply, pp. 5-6. However, Respondent is correct that there is no constitutional right to counsel in post-conviction proceedings, and therefore Petitioner cannot overcome the application of a procedural bar by claiming that his post-conviction counsel was ineffective. <u>Coleman</u>, 501 U.S. at 752 (because there is no constitutional right to representation in state post-conviction proceedings, a petitioner "'bear[s] the risk of attorney error that results in a procedural default'") (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)); <u>Spears</u>, 343 F.3d at 1255 (citing 28 U.S.C. § 2254(i), <u>Coleman</u>, and <u>Smallwood</u>, 191 F.3d at 1269, for the proposition that "ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default"); <u>Thomas v. Gibson</u>, 218 F.3d 1213, 1222 (10th Cir. 2000) (relying on "well-established Supreme Court precedent" to reject an allegation of cause based upon post-conviction counsel's representation).[7]

The second exception can be met by showing that a fundamental miscarriage of justice will occur if the claim is not heard. The fundamental miscarriage of justice exception

---

[7] This remains unchanged by the Supreme Court's recent decision in <u>Martinez v. Ryan</u>, 566 U.S. ___, 132 S. Ct. 1309 (2012). <u>Hogan v. Trammell</u>, 511 F. App'x 769, 775 (10th Cir. 2013) (unpublished), <u>cert. denied</u>, ___ U.S. ___, 134 S. Ct. 645 (2013); <u>Banks</u>, 692 F.3d at 1147-48.

addresses those rare instances "where the State has convicted the wrong person of the crime." Sawyer v. Whitley, 505 U.S. 333, 340 (1992). Thus, to meet the exception, a petitioner must make "a colorable showing of factual innocence." Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000). This requires Petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995). "In the specific context of a sentencing challenge, the Supreme Court has held actual innocence requires the petitioner to show 'by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law.'" Brecheen v. Reynolds, 41 F.3d 1343, 1357 (10th Cir. 1994) (quoting Sawyer, 505 U.S. at 348). See also Black, 682 F.3d at 915-16. Here Petitioner makes two arguments. First, despite his videotaped confession, Petitioner contends that he is actually innocent. Petitioner supports his allegation of innocence with three affidavits which amount to nothing more than abject conjecture. Petition, p. 98 (referencing Petition Attachments 24-26). This falls woefully below the standard required to establish a miscarriage of justice based on actual innocence. Second, regarding his death sentences, Petitioner additionally asserts that his mental retardation makes him death penalty ineligible. However, for reasons discussed in Ground Two, infra, the Court finds that Petitioner has not made a sufficient demonstration that he is mentally retarded.

In summary, for the reasons set forth above, the Court finds that the portion of Petitioner's Ground One which is based on Ms. Johnson's allegations that she was forced to testify at trial in order to get her children back is procedurally barred. As a result, the entirety

of Petitioner's third claim, concerning the impartiality of the state court trial judge, is procedurally barred because it is based on Ms. Johnson's allegations regarding the taking of her children (and the trial judge's involvement therewith). Petitioner's remaining three claims will be considered hereinafter without consideration of this previously known information.

The OCCA applied its own Rule 9.7(G)(3) to bar a merits review of the claims arising from the allegations contained in Mr. Berry's affidavit and the new allegations contained in Ms. Johnson's affidavit. This rule provides as follows: "No subsequent application for post-conviction relief shall be considered by [the OCCA] unless it is filed within sixty (60) days from the date the previously unavailable legal or factual basis serving as the basis for a new issue is announced or discovered." Affording Petitioner the greatest deference, the OCCA used the execution dates of each affidavit as the starting time for the permitted 60-day filing period. Accordingly, Petitioner had until February 7, 2010, to file new claims based on Ms. Johnson's affidavit, and until March 12, 2010, to file new claims based on Mr. Berry's affidavit. Because Petitioner did not file his second post-conviction application until April 20, 2010, the OCCA applied Rule 9.7(G)(3) to bar a merits review of this newly discovered information. Smith, 245 P.3d at 1238.

Although the OCCA's 60-day rule is straightforward, operating like a statute of limitations, the extensive arguments presented by the parties show that the issue of whether Rule 9.7(G)(3) should be enforced as a procedural bar in this case is both complex and debatable. In addition to whether the rule is adequate, there is also a question as to the effect

of the OCCA's order granting Petitioner an extension of time to file his second post-conviction application.[8]  Rather than address these "thorny procedural issues," the Court finds that the better course is to avoid these "procedural complications" and "dispose[] of [Petitioner's remaining claims] in straightforward fashion on substantive grounds." Revilla v. Gibson, 283 F.3d 1203, 1210-11 (10th Cir. 2002).  See also Hooks v. Workman, 689 F.3d 1148, 1179 (10th Cir. 2012) (applying Revilla).  De novo review applies.  Wood v. Milyard, 721 F.3d 1190, 1194 (10th Cir. 2013); Littlejohn v. Trammell, 704 F.3d 817, 861 (10th Cir. 2013).

As previously noted, in his first and second claims, Petitioner contends that he is entitled to relief due to the prosecution's failure to disclose exculpatory evidence and/or correct perjured testimony.  In his fourth claim, Petitioner additionally asserts that his trial counsel was ineffective for either (1) "failing to investigate, uncover and present [the exculpatory evidence] to [the] jury" or (2) failing to do something with the exculpatory evidence if they in fact had knowledge of it.  Petition, p. 19.  Petitioner describes both Ms. Johnson and Mr. Berry as key witnesses.  Petitioner asserts that they were the reason his murder charges were jointly tried, and that their testimony was used to corroborate his confession and prove his guilt.  Petition, p. 9.

---

[8] Given the arguments presented in the Reply against the application of a procedural bar based on Rule 9.7(G)(3), it would have been beneficial to receive an additional response from Respondent.

Before delving into the merits of Petitioner's claims, the Court must note its grave doubt about the averments made by Ms. Johnson and Mr. Berry, especially under the facts and circumstances of this case. As Justice Brennan once stated, "[r]ecantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from the denial of certiorari and application for stay). At trial, both of these witnesses made it abundantly clear that they did not want to testify against Petitioner. Petitioner is a Crips gang member and the crimes he committed were gang related. Ms. Johnson testified at trial that she was scared and that she was testifying against Petitioner only because she was under court order to appear (J. Tr. 8, 26). Mr. Berry, who was only fifteen years old when the crimes were committed and sixteen when he testified, was Petitioner's roommate. Mr. Berry described Petitioner as his "close friend, more like a cousin." Like Ms. Johnson, Mr. Berry was afraid to testify and the only reason he did was because he had been subpoenaed. Mr. Berry's reluctance to testify was so apparent that the trial court permitted the prosecution to question him as a hostile witness (J. Tr. 5, 79-89, 119).

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution." Favorable evidence includes impeachment evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting Bagley, 473 U.S. at 682).

Regarding false testimony, "the [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (footnotes omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269 (1959).

Finally, claims of trial counsel ineffectiveness are governed by Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, a petitioner must show that his counsel's performance was deficient and that he was prejudiced by it. Strickland, 466 U.S. at 687. Beyond pointing to an error or omission on the part of trial counsel, Strickland requires a showing of actual prejudice. Id. at 687. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Applying the foregoing authority to Petitioner's claims, the Court concludes that no relief is warranted. Given all of the presented evidence, and particularly Petitioner's confession, the averments made by Ms. Johnson and Mr. Berry do not cause this Court to question the outcome of Petitioner's trial.[9]

Beyond the allegations regarding her children (which as discussed above have been procedurally barred), Ms. Johnson makes two statements in her affidavit regarding her testimony at trial. Ms. Johnson states that although Petitioner never made such comments to her, police detectives told her to testify that Petitioner told her (1) he set the convenience store clerk and the cash register on fire; and (2) why he shot the convenience store clerk. Petition Attachment 12. In addition to discussing the circumstances surrounding his videotaped statement to police, Mr. Berry asserts that the police told him what to say, both before and during the interview. Particularly, Mr. Berry asserts that he was told that he "shouldn't say anything about PCP because it would make [Petitioner] look bad." Mr. Berry claims that he first learned of Phillip Zachary, Ms. Moore's son, from the police, and that he had "never heard [Petitioner] call him a snitch." Mr. Berry additionally states that two of his statements made during his interview were assumptions: (1) that he saw the butt of a .357 revolver on Petitioner's person before the murders; and (2) that Petitioner told him that he killed Ms. Moore. Finally, Mr. Berry asserts that although he was a member of Petitioner's

---

[9] This Court makes this determination without any consideration of the additional affidavits produced by Respondent in opposition.

gang at the time of trial, he covered up a gang-affiliated tattoo at the request of the police in order to "look presentable." Petition Attachment 10.

Assuming that all of this new information had been made known to defense counsel and presented to Petitioner's jury, there is no reasonable probability or likelihood that the jury's verdicts would have been affected. First and foremost, Petitioner confessed, and his confession was recorded on videotape. The recorded confession was shown to the jury during stage one (in redacted form) and stage two (unredacted) of Petitioner's trial (J. Tr. 10, 10-14; J. Tr. 14, 79-80, 85, 89; State's Exhibits 85 and 124). In his confession, Petitioner admits to killing both Ms. Moore and Mr. Pulluru. With respect to Ms. Moore, Petitioner stated that he knew Ms. Moore's son, Phillip; that Phillip was a snitch; that he told numerous people that Phillip was a snitch; and that he did not like snitches. Petitioner stated that Ms. Moore was killed because she was in the wrong place at the wrong time. Although he was looking for Phillip and did not go to the apartment to kill Ms. Moore, Petitioner stated that because she panicked, he had no choice. On the videotape, Petitioner demonstrates the way he shot Ms. Moore, and the way he wiped down anything he had touched to remove fingerprints. Petitioner went directly from Ms. Moore's apartment to the convenience store. Petitioner admitted to killing Mr. Pulluru in retaliation for statements made in the newspaper about a fellow Crips gang member (T-Nok) who had been killed at a neighboring convenience store during a robbery. Petitioner stated that he shot Mr. Pulluru with multiple bullets from two .357 handguns. After the killing, Petitioner poured "gas" on Mr. Pulluru and the cash register and set a fire to cover the evidence.

In light of Petitioner's confession, Ms. Johnson's post-trial averments that a portion of her testimony was made at the urging of the police is without consequence. As noted above, in his confession, Petitioner himself provides these details. In addition, and contrary to Petitioner's assertions, this portion of her testimony was not needed to establish corroboration of his confession. See Smith, 157 P.3d at 1174 (citing Fontenot v. State, 881 P.2d 69, 77-78 (Okla. Crim. App. 1994), for the proposition that in order "[f]or a confession to be sufficiently reliable to support a conviction, it must be supported by substantial independent evidence tending to establish its trustworthiness"). Beyond other testimony given by Ms. Johnson regarding not only the murder of Mr. Pulluru but Ms. Moore as well, Petitioner's confession was corroborated by the crime scene evidence, including expert testimony that the same gun was used in both murders, and medical testimony regarding the manner in which both victims were killed. In addition, there was the evidence of Ms. Johnson's calls to Crime Stoppers, a police hotline. Prior to Petitioner's interview by police, Ms. Johnson called the hotline and stated that Petitioner had committed both crimes. At that point, the only other persons who knew the crimes were connected were Petitioner, the police, and the ballistics expert (M. Tr. 5/12/03, 17-19; Defendant's Exhibit 1) (J. Tr. 8, 42, 56-59; J. Tr. 9, 115-19, 190-91). This was significant and unchallenged evidence connecting the crimes.

Regarding Mr. Berry's post-trial averments, the Court views them with the utmost skepticism.[10] Mr. Berry's affinity for Petitioner was ever-apparent at trial, where his struggle to testify against Petitioner brought forth wavering and inconsistent testimony. As noted above, after testifying on direct examination inconsistently with his videotaped interview, Mr. Berry was declared a hostile witness. He was then impeached by the prosecution with his videotaped statements several times (J. Tr. 5, 78-119). See Smith, 157 P.3d at 1172 n.14 (treating the prosecution's use of the videotape as impeachment evidence). However, even after being impeached on direct examination with his videotaped statements, Mr. Berry's testimony continued to oscillate. For example, Mr. Berry testified on direct examination that Petitioner told him that "[s]nitches need to be in ditches," but on cross-examination he testified that Petitioner never said that. On redirect, Mr. Berry testified that Petitioner said, "They just need to be dead" (J. Tr. 5, 106, 124, 137). In addition, regarding whether or not Petitioner told Mr. Berry that he killed Ms. Moore, Mr. Berry testified on direct examination that Petitioner both did and did not, then testified on cross-examination that he did not, and then on redirect examination that he did (J. Tr. 5, 83, 111-13, 128-29, 138). Given this history, Mr. Berry's credibility has been impugned, making it impossible to determine which version is the truth.

---

[10] This skepticism is only heightened by a viewing of Mr. Berry's videotaped interview with a case investigator. In the interview, a female investigator questioned Mr. Berry in a conversational tone, and Mr. Berry appeared reasonably relaxed and confident in his answers. No indications of coaching or coercion are apparent in the interview.

In addition to the inherent credibility problem with Mr. Berry, the Court finds that like Ms. Johnson, Mr. Berry's post-trial averments do not cause the Court to question whether this information would have affected the outcome of Petitioner's trial. Again, this is a case with a detailed confession. As outlined above, in his confession, Petitioner admits that he killed both Ms. Moore and Mr. Pulluru, and Petitioner's confession is overwhelmingly corroborated by Ms. Johnson's Crime Stoppers calls and her testimony at both the preliminary hearing and trial, the physical evidence, and the expert testimony. See Smith, 157 P.3d at 1173 n.15 (finding that even if Mr. Berry's testimony is entirely discounted, Ms. Johnson's testimony regarding Ms. Moore's murder is sufficient to corroborate Petitioner's confession and link Petitioner to the murder).

For the foregoing reasons, the Court finds that Petitioner is not entitled to relief on the first, second, and fourth claims presented in his Ground One. Having reviewed these claims on the merits, the Court finds that Petitioner has failed to show that the prosecution withheld material evidence, that his convictions were obtained through the use of perjured testimony, or that his trial counsel was ineffective. Having previously determined that Petitioner's third claim is procedurally barred, the Court hereby denies Petitioner's Ground One in its entirety.

**B.    Ground Two:        Mental Retardation.[11]**

In Ground Two, Petitioner asserts that in accordance with the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304 (2002), his death sentences cannot stand because he is mentally retarded.  Petitioner raised this claim for the first time in his second post-conviction application.  Although the OCCA ultimately found Petitioner's claim to be procedurally barred, it did so only after concluding, through the lens of ineffective assistance of counsel, that the underlying claim was without merit.  Smith, 245 P.3d at 1235-38. Because Petitioner's claim is easily disposed of, the Court elects to bypass the procedural bar issue, review Petitioner's claim de novo, and deny relief on the merits.  Revilla, 283 F.3d at 1210-11.

Under Oklahoma law, mental retardation is defined as "significantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning."  Okla. Stat. tit. 21, § 701.10b(A)(1).[12]  Oklahoma law recognizes that "[a]n intelligence quotient of seventy (70) or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning[,]" and "[i]n determining the intelligence quotient, [Oklahoma law mandates that] the standard

---

[11] For the reasons acknowledged by the Tenth Circuit in Howell v. Trammell, 728 F.3d 1202, 1206 n.1 (10th Cir. 2013), and Hooks, 689 F.3d at 1159 n.1, the Court will use the terms "mental retardation" and "mentally retarded" in its discussion of Petitioner's Ground Two.

[12] Oklahoma law also requires that "the onset of the mental retardation must have been manifested before the defendant attained the age of eighteen (18) years."  Okla. Stat. tit. 21, § 701.10b(B).

measurement of error for the test administrated . . . be taken into account." Giving

consideration to the standard error of measurement, Oklahoma law additionally provides that

"*in no event* shall a defendant who has received an intelligence quotient of *seventy-six (76)*

*or above* on *any* individually administered, scientifically recognized, standardized

intelligence quotient test administered by a licensed psychiatrist or psychologist, be

considered mentally retarded . . . ." Okla. Stat. tit. 21, § 701.10b(C) (emphasis added).

It is undisputed that Petitioner received two I.Q. scores of 76 or above. In 2001, at

the age of 18, Petitioner received an I.Q. score of 76, and in 2003, in preparation for trial,

Petitioner received an I.Q. score of 79. In accordance with Oklahoma law, these scores

prevent Petitioner from being considered mentally retarded. Nevertheless, Petitioner

contends that when these scores are adjusted for the Flynn Effect, they fall within

Oklahoma's parameters for mental retardation. The problem with this argument, however,

is that Oklahoma does not recognize the Flynn Effect, and to date, its consideration has not

been mandated by the Supreme Court.[13]  See Hooks, 689 F.3d at 1169-70 (referencing the

OCCA's decision in Petitioner's case; noting that "Atkins does not mandate an adjustment

for the Flynn Effect[;]" and acknowledging that even if the Circuit believed that the Flynn

Effect should be considered, it could not so hold on habeas review); Smith, 245 P.3d at 1237

n.6 (noting that "[t]he Flynn Effect has not achieved universal acceptance in courts where

---

[13] In Hall v. Florida, 572 U.S. ___, 134 S. Ct. 1986 (2014), the Supreme Court recently found
Florida's I.Q. test score cutoff of 70 to be unconstitutional. Unlike Oklahoma, Florida did not take
into consideration the standard error of measurement. Hall, 134 S. Ct. at 1994-96. Petitioner's
request to file supplemental briefing on the applicability of Hall was denied. Doc. 66.

it has been raised" and that regardless of its validity, it is not a part of Oklahoma's statutory scheme). For these reasons, Petitioner's Ground Two lacks merit and is hereby denied.

### C.    Ground Three:    <u>Miranda</u>[14] Waiver.

In Ground Three, Petitioner asserts that his confession should not have been admitted against him at trial because he did not knowingly, voluntarily, or intelligently waive his constitutional rights.  Petitioner also claims that his trial, appellate, and post-conviction counsel were all ineffective for failing to fully investigate and present all evidence relevant to this claim. Petitioner presented these claims to the OCCA on direct appeal and in his second post-conviction application.  The OCCA addressed the merits of the claims and denied relief.[15]  <u>Smith</u>, 245 P.3d at 1238-42; <u>Smith</u>, 157 P.3d at 1170-72.  Therefore, the question is whether the OCCA's decisions are contrary to or an unreasonable application of Supreme Court law.  The Court easily concludes that they are not.

In his Petition, Petitioner challenges the OCCA's direct appeal decision on several grounds.  First, Petitioner asserts that the OCCA made an unreasonable determination of the facts by characterizing his behavior during the interrogation as calm.  He also takes issue

---

[14] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[15] Although Respondent asserts that Petitioner's ineffectiveness claims were procedurally barred by the OCCA, the Court disagrees.  Because one of Petitioner's attorneys represented him at trial and on direct appeal, the OCCA addressed the merits of Petitioner's claims through the lens of ineffective assistance of post-conviction counsel. Nowhere in its disposition of Petitioner's ineffectiveness claims does the OCCA even reference, much less apply, its procedural rules. Because the OCCA addressed Petitioner's ineffectiveness claims on the merits, it is subject to AEDPA deference.  <u>Richter</u>, 131 S. Ct. at 784-85 ("[I]t may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

with the state courts' failure to consider and receive evidence about his level of intelligence. Finally, Petitioner contends that the OCCA's decision is in conflict with <u>Rogers v. Richmond</u>, 365 U.S. 534 (1961), "because the state courts impermissibly focused on the substance of [his] statement in finding a waiver." Petition, p. 44.

Relevant to Petitioner's challenges, the OCCA on direct appeal held as follows:

In this proposition, [Petitioner] claims his in-custody extrajudicial confession should not have been admitted as evidence because his waiver of <u>Miranda</u> [FN10] rights was unknowing and involuntary. [Petitioner] also claims that the district court did not apply the correct constitutional standards in evaluating whether he voluntarily and knowingly waived his <u>Miranda</u> rights.

FN10. <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

To determine whether a confession is the result of free and unconstrained choice we look to the totality of the circumstances surrounding it, including the defendant's character and the details of the interrogation. <u>Salazar v. State</u>, 1993 OK CR 21, ¶ 12, 852 P.2d 729, 733. The State must prove the validity of a <u>Miranda</u> waiver by a preponderance of the evidence. <u>Le v. State</u>, 1997 OK CR 55, ¶ 7, 947 P.2d 535, 542. Where sufficient evidence supports the trial court's in camera ruling that a defendant's statements are voluntary, we will not disturb that ruling. <u>Id.</u>

. . . .

[Petitioner] . . . argues that he was incapable of knowingly and voluntarily waiving his rights because he was under the influence of the drug Phencyclidine (PCP) at the time he was interrogated. [Petitioner] was arrested at 12:27 p.m. on February 24, 2002. Detectives conducted the interview in question three days later on February 27th at 8:30 p.m. At the <u>Jackson v. Denno</u> [FN11] hearing held to determine the admissibility of the videotaped confession, [Petitioner] put on evidence that he was a long term PCP user. Additionally, in the interview tape itself, [Petitioner] admits to being under the influence of the drug at the time of his arrest three days earlier. The arresting officer testified that at the time of arrest, [Petitioner] appeared to be under the influence of drugs. Jailers at the Oklahoma County Jail testified that

[Petitioner] appeared to be under the influence of drugs to such an extent that when he was initially processed into the facility he had to be restrained and placed in isolation. A day later, [Petitioner] was released into the general population, and the interrogation did not occur until at least one day after that. Thus, the interrogation in which [Petitioner] waived his Miranda rights took place three days after his arrest, and presumably, at least three days after he ingested his last dose of PCP. The interrogating officers testified that at the time of the interview, [Petitioner] did not appear to be under the influence of drugs or alcohol. The videotape of the confession interview displays a coherent [Petitioner] calmly conversing with detectives, giving rational answers to their questions, and apparently capable of understanding the Miranda warnings provided by the interrogating officers. This record provides more than sufficient evidence to support the district court's determination that [Petitioner] knowingly and voluntarily waived his rights under Miranda.[FN12]

> FN11. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), established a defendant's right to an *in camera* hearing on the voluntariness of a confession.

> FN12. In any event, even if [Petitioner] was still under some lingering effects of PCP at the time of his videotaped interview, "[s]elf-induced intoxication, short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not render a confession inadmissible, but goes only to the weight to be accorded to it." Coddington, 2006 OK CR 34, ¶ 38, 142 P.3d at 448 (quoting Moles v. State, 1974 OK CR 57, ¶ 6, 520 P.2d 822, 824).

[Petitioner] also argues that the district court failed to properly evaluate the validity of the Miranda waiver under the totality of the circumstances standard. [Petitioner's] specific complaint is that the judge refused to allow a neuropsychologist, Dr. Bianco, to testify at the suppression hearing as to his [[Petitioner's]] intelligence. According to [Petitioner], Dr. Bianco's testimony was necessary to establish that he was of low intelligence and as a result was unable to comprehend the nature or consequences of the rights he was waiving. [Petitioner] also complains that the trial judge improperly relied on her observations of him in the interrogation videotape in reaching her conclusion about his intelligence. He argues that the videotape improperly focused the attention of the judge on issues relating to his culpability rather than his ability to voluntarily waive his right to remain silent.

At the suppression hearing, [Petitioner] made a detailed offer of proof as to Dr. Bianco's proposed testimony. Specifically, [Petitioner] offered that Dr. Bianco would testify as to [Petitioner's] intelligence level as determined by various tests. [Petitioner] also proffered that the doctor would advise the court on his observations of the differences between [Petitioner's] conduct as depicted on the confession videotape and [Petitioner's] conduct during an interview conducted by the doctor over a year later. The Court rejected the offer of proof and ruled Dr. Bianco's testimony not relevant to the question of the validity of [Petitioner's] waiver.

We have reviewed the trial court's rationale for denying Dr. Bianco's testimony and agree that the proffered expert testimony was not relevant. Moreover, the numerous examples cited by the district court judge of her observations of various aspects of [Petitioner's] conduct and statements during the interview and the court's explanation of how those examples illustrated a sufficient level of intelligence convince us that the district court did not confuse the substance of the taped confession and its relevance to the issue of culpability with the substance of the tape as evidence of [Petitioner's] mental abilities. The record shows the trial court judge had sufficient evidence before her to find by a preponderance of evidence that [Petitioner] knowingly and voluntarily waived his <u>Miranda</u> rights. This proposition of error is denied.

<u>Smith</u>, 157 P.3d at 1170-72.

Within its analysis, the OCCA specifically found that "[t]he videotape of the confession interview displays a coherent [Petitioner] calmly conversing with detectives, giving rational answers to their questions, and apparently capable of understanding the <u>Miranda</u> warnings provided by the interrogating officers." <u>Id.</u> at 1171. This finding of fact is presumed correct absent a "clear and convincing" showing by Petitioner that it is incorrect. 28 U.S.C. § 2254(e)(1). Petitioner takes issue with the finding, asserting that he answered "questions in an increasingly animated manner with multiple, aberrant vocal inflections, inappropriate for the situation." Petition, p. 42.

The Court finds that Petitioner has not overcome the presumption of correctness because the OCCA's characterization of his interview is accurate. Petitioner has repeatedly asserted that he was under the influence of PCP at the time the interview was conducted; however, his behavior in the interview is in stark contrast to the evidence Petitioner presented regarding his behavior while under the influence of PCP. As detailed in his Petition, when under the influence of PCP, Petitioner's behavior has been described as "erratic," "'out of control,'" "uncooperative," "threatening," "'belligerent,'" "'irrational,'" and "'combative.'" Petition, pp. 38-40 (citations omitted). Given this evidence, Petitioner's behavior in the interview was relatively calm. Petitioner was animated at some points during the interview, but his behavior did not appear extraordinary or out of context for a gang member being interviewed about multiple murders by two police detectives. It is interesting to note as well that after questioning ended, Petitioner was videotaped for an extended period of time as he sat alone in the room. Petitioner did not appear nervous or anxious during this time, but was calm and waited patiently. When he needed something, he compliantly knocked on the door and made his requests in a respectful manner. For these reasons, the Court finds that Petitioner has failed to show that the OCCA made an unreasonable determination of the facts.

Petitioner also takes issue with the state courts' failure to consider and receive evidence about his level of intelligence. Petitioner faults the OCCA for not applying the complete Miranda standard for assessing the validity of a waiver, and he faults the state trial court for excluding expert testimony about his low intelligence. In Miranda, the Supreme Court held that a defendant may waive his Miranda rights "provided the waiver is made

31

voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444. In <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986), the Supreme Court found that a <u>Miranda</u> waiver "has two distinct dimensions."

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Id.</u> (citations omitted). The Court finds that Petitioner has not shown that the state courts' determination that Petitioner effectuated a valid waiver of <u>Miranda</u> rights is contrary to or an unreasonable application of Supreme Court law.

First, from a plain reading of the OCCA's opinion, it is clear that the OCCA fully grasped the issue at hand and assessed it in light of constitutional principles. At the onset of its analysis, the OCCA set forth the following standard of review:

> To determine whether a confession is the result of free and unconstrained choice we look to the totality of the circumstances surrounding it, including the defendant's character and the details of the interrogation. The State must prove the validity of a <u>Miranda</u> waiver by a preponderance of the evidence. Where sufficient evidence supports the trial court's in camera ruling that a defendant's statements are voluntary, we will not disturb that ruling.

<u>Smith</u>, 157 P.3d at 1170 (citations omitted). This standard is consistent with Supreme Court authority.

Second, although the OCCA found no error in the trial court's exclusion of expert testimony regarding Petitioner's purportedly low intelligence, it is clear that Petitioner's

ability to comprehend his rights and effectuate a wavier thereof was fully considered by both courts in their rulings. In its opinion, the OCCA acknowledged "the numerous examples" referenced by the trial judge which convinced her that Petitioner was of sufficient intelligence and that no expert testimony was necessary on that point. Smith, 157 P.3d at 1171. These examples included the following:

(1) "I mean, having watched the tape [Petitioner] is very cocky. He is extremely verbal about how he tricks people and misleads them and has got them convinced how crazy he is. He obviously can read because he talks about how he read the newspaper that day to see the clerk's comments and as part of his retaliation" (M. Tr. 5/21/03, 39);

(2) "Now, the fact that he's a low intelligence I don't think is a huge surprise to anybody based on the fact that we all deal with criminal law and most of the Defendants who come in here are not rocket scientists. Is there any law that says that I am to take that into consideration in Jackson v. Denno? Even someone of low intelligence. He obviously was able to plan how to switch clothes with different people and conceal his identity, confuse people. I mean, I'm thinking that's a pretty smart cookie, street smart anyway" (M. Tr. 5/21/03, 40);

(3) "[Petitioner] talks about how he was hiding at different places when the police were looking for him and he was able to conceal himself and persuade other people to help him in his conspiracy to remain free from arrest. I don't know a whole lot about gangs, but this is a guy who said he didn't have a job and the Crips are known to be a little more violent than some of the other gangs. And he's able to get apartments and to do this and to do that. I'm thinking he got the money somewhere, so that would tell me that he's somewhat smart. And so if he's smart enough to do all of those different things, identify neighborhoods where different sets are at, talk about different kinds of gang activities, he knows all the gang task force. I mean, he talks openly about what he is willing to give up to the cops and what he isn't and, you know. I mean, I can't see that what you're going to tell me in regard to him being of low intelligence is going to establish that he didn't understand what he was doing when he waived Miranda" (M. Tr. 5/21/03, 40-41);

(4)     "So, we don't have a situation where in my opinion there's been an issue raised on the videotape that he clearly didn't understand. I can foresee a situation where perhaps someone in the interview process would be so clearly disoriented or unable to comprehend, that then the testimony would be relevant whether or not he possessed that ability. But, you know, I've got an hour and a half to two hours of watching somebody who was extremely animated and disturbingly explanatory about the murders he committed and how they were other people's fault. So, I don't think that I see any relevance to what you're prepared to put before the Court for the purposes of this hearing" (M. Tr. 5/21/03, 41-42);

(5)     What I'm saying is that the truth or the veracity of the statement or examples that I gave, I'm giving you as examples of his ability to reason, make intelligent decisions, to co-op other people into his plan and to understand perfectly the consequences of his actions as he's trying to avoid capture. And I'm saying nothing in that indicates to me that this is a person who doesn't understand or is - - raises the kinds of issues that would require me, I think, to hear the testimony of your expert" (M. Tr. 5/21/03, 42-43); and

(6)     "Well, I'm going to summarize by saying that I do believe that there are circumstances under which the testimony that you have proffered by this expert would be relevant. The State's Exhibit 1 that I watched, I don't believe causes those issues to arise here. I believe that there are many indicias [sic] demonstrated that this Defendant possessed intelligence and certainly I have no way of gauging his intelligence level or malingering. I don't purport to know any of those things, but over a two-hour period of time, he demonstrated in many different ways his understanding of what was going on. I don't believe that specific testimony regarding his specific IQ range would be relevant . . . (M. Tr. 5/21/03, 50).

From this record, it is clear that the trial judge considered Petitioner's "requisite level of comprehension" in determining the validity of the Miranda waiver. Moran, 475 U.S. at 421. It is also clear that the OCCA considered these examples of intellectual functioning to find that "the trial court judge had sufficient evidence before her to find by a preponderance of

evidence that [Petitioner] knowingly and voluntarily waived his <u>Miranda</u> rights." <u>Smith</u>, 157 P.3d at 1171-72.

Petitioner's final argument with respect to the OCCA's direct appeal opinion is that it conflicts with the Supreme Court's decision in <u>Rogers</u>. In <u>Rogers</u>, 365 U.S. at 543-44, the Supreme Court held that the veracity of confession is not to be considered in determining its admissibility.

> [F]or purposes of the Federal Constitution, . . . the question [is] whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth.

<u>Id.</u> at 544. Contrary to Petitioner's assertion, however, neither the trial court nor the OCCA violated the principle announced in <u>Rogers</u>. As the OCCA found, the Court agrees that the examples and explanations given by the trial judge show "that [she] did not confuse the substance of the taped confession and its relevance to the issue of culpability with the substance of the tape as evidence of [Petitioner's] mental abilities." <u>Smith</u>, 157 P.3d at 1171.

Petitioner additionally asserts that his trial, appellate, and post-conviction counsel were all ineffective for failing to fully investigate and present all evidence relevant to the constitutional validity of his <u>Miranda</u> waiver. Specifically, Petitioner asserts that counsel should have (1) conducted further investigation regarding his PCP intoxication and (2) should have investigated and presented evidence of his organic brain damage and mental retardation. Petition, p. 45. Petitioner presented these arguments to the OCCA in his second

post-conviction application. The Court finds that the OCCA denied relief on the merits in a thorough and well-reasoned application of the <u>Strickland</u> standard.

Regarding the PCP intoxication issue, the OCCA found that Petitioner was not prejudiced by counsel's failure to further develop this issue. <u>Smith</u>, 245 P.3d at 1239-41. Reviewing the evidence which trial counsel presented as well as the additional evidence Petitioner asserts should have been presented, the OCCA concluded as follows:

> We find that this proffered evidence is insufficient to show that trial counsel was ineffective. Specifically, we are convinced that expert testimony such as that contained in these two reports would not have changed the district court's decision on the voluntariness of [Petitioner's] waiver or our opinion on direct appeal affirming that decision. <u>See Strickland</u>, 466 U.S. at 693–94, 104 S.Ct. at 2067–68 (holding that to establish prejudice sufficient to warrant finding of ineffective assistance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

> In finding that [Petitioner] voluntarily waived his <u>Miranda</u>-warned rights, the district court had already heard Dr. Kupiec's testimony explaining that [Petitioner] could have been experiencing lingering effects of PCP intoxication when he was interviewed three days after his arrest. Dr. Saint Martin and Dr. Mash's reports add nothing new in this regard. The only things that Dr. Saint Martin and Dr. Mash add are their observations of [Petitioner's] conduct during the interview and their opinions based on those observations that [Petitioner] was of such limited intellectual functioning and so intoxicated by PCP at the time he waived his <u>Miranda</u>-warned rights that he could not understand what he was doing.

> While the trial court sitting as the trier of fact in this instance did not have Dr. Mash or Dr. Saint Martin's opinions before her, she did hear a proffer from defense counsel that a neuropsychologist, Dr. Faust Bianco, would testify as to [Petitioner's] low intelligence and how his slowness in processing information would have been exacerbated by PCP. The court was also told that Dr. Bianco would testify as to the differences between [Petitioner's] behavior on the videotape and his behavior when Dr. Bianco interviewed him one year later.

After hearing the proffer and ruling that Dr. Bianco's testimony about [Petitioner's] intelligence and differing behavior in the two settings would be irrelevant, the district court judge explained in detail how her own observations of [Petitioner] during the two-hour videotaped interview showed a cocky and extremely verbal individual, who was able to mislead people, read a newspaper, persuade others to assist him in hiding and avoiding arrest, conceal his identity, obtain an apartment, and explain various gang activities. According to the judge, these observations convinced her that [Petitioner] demonstrated sufficient intelligence and sufficiently clear thinking for her to find that the State had met its burden of showing that [Petitioner's] waiver of rights was voluntary. On direct appeal, we concluded that the videotaped interview showed "a coherent [Petitioner] calmly conversing with detectives, giving rational answers to their questions, and apparently capable of understanding the <u>Miranda</u> warnings provided by the interrogating officers." <u>Smith v. State</u>, 2007 OK CR 16, ¶ 46, 157 P.3d 1155, 1171.

Based on the district court's careful review of [Petitioner's] behavior on the interview tape, and in light of the fact that the district court heard expert testimony that [Petitioner] may have been suffering from the lingering effects of PCP intoxication at the time of this interview and received proffered evidence of [Petitioner's] low intelligence, we do not find a reasonable likelihood that testimony from Dr. Mash or Dr. Saint Martin (or both) would have changed the outcome of the judge's conclusion that [Petitioner] voluntarily waived his <u>Miranda</u>-warned rights. Nor do their opinions change our conclusion as stated in [Petitioner's] direct appeal that the trial court's finding was proper.

Because there is not a reasonable likelihood that Dr. Mash and Dr. Saint Martin's testimony would have changed the outcome of the trial court's decision on the voluntariness of [Petitioner's] <u>Miranda</u> waiver, [Petitioner] fails to show prejudice flowing from the alleged errors committed by trial, appellate, and post-conviction counsel. This claim does not qualify for relief under <u>Strickland</u>.

<u>Smith</u>, 245 P.3d at 1240-41.[16]

---

[16] Related to Petitioner's PCP use, the OCCA gave separate consideration to Petitioner's claim that his attorneys "were ineffective in their challenge to the voluntariness of his statements for not providing the trial court with expert evidence that ([Petitioner]) suffered from organic brain damage and low intelligence (caused by his long term daily use of PCP)." <u>Smith</u>, 245 P.3d at 1241. Here, the OCCA found that the record "belied" the assertion that counsel were ineffective in this

In disposing of this portion of Petitioner's ineffectiveness claim on the prejudice prong, the OCCA acted within the guidance given by the Supreme Court in <u>Strickland</u>. In <u>Strickland</u>, the Supreme Court expressly held that

> there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as did the Supreme Court in <u>Strickland</u>] or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

<u>Strickland</u>, 466 U.S. at 697. A showing of prejudice under <u>Strickland</u> "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. Evaluating the OCCA's decision in light of <u>Strickland</u> and the deference afforded it by the AEDPA, the Court finds that Petitioner has not met the high standard required for relief.[17]

_____

respect. Because counsel had argued this very point to the trial court, the OCCA found that counsel were not deficient. <u>Id.</u> at 1241-42. The Court finds that this determination by the OCCA is also not contrary to or an unreasonable application of <u>Strickland</u>.

[17] In support of this portion of his claim, Petitioner has provided several affidavits (Petition Attachments 14-18 and 32), that he intentionally excluded from his second post-conviction application. <u>Smith</u>, 245 P.3d at 1240 (referencing Petitioner's Appendix of Exhibits and noting that certain exhibits were removed because Petitioner deemed them irrelevant to the presented issues). Because these affidavits were not presented to the OCCA, they have not been considered here. <u>See</u> <u>Pinholster</u>, 131 S. Ct. at 1398 (2011) (review under the AEDPA is "limited to the record that was before the state court that adjudicated the claim on the merits").

The OCCA additionally found that Petitioner was not prejudiced by counsel's failure to challenge his <u>Miranda</u> waiver on grounds that "he was mentally retarded and suffering organic brain damage from long-term drug abuse." <u>Smith</u>, 245 P.3d at 1242. The OCCA held as follows:

> In support of this claim, [Petitioner] relies on those portions of Dr. Mash and Dr. Saint Martin's 2010 reports that opine that [Petitioner] is mentally retarded and that [Petitioner's] substance abuse could have caused brain damage that impaired his cognitive functioning to the extent that he could not adequately comprehend the <u>Miranda</u> warnings given him by police or assess the consequences of a waiver of the rights covered by those warnings.

> Again, to prevail on a claim of ineffectiveness of counsel, a defendant must show prejudice from the alleged error of counsel, <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. at 2064, and to establish prejudice, "[it] is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," <u>id.</u> at 693, 104 S.Ct. at 2067. Rather, a defendant must show "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694, 104 S.Ct. at 2068.

> In this instance, despite argument and proffers of evidence from counsel about [Petitioner's] low intelligence and mental impairment from drug abuse, the trial court judge concluded that [Petitioner] had sufficient intellectual functioning to waive his <u>Miranda</u>-warned rights. To support her conclusion, the judge gave a detailed account of her own observations of [Petitioner's] behavior on the two-hour police interview videotape and explained how [Petitioner's] behavior on that tape convinced her that [Petitioner] possessed sufficient intelligence and cognitive functioning to voluntarily waive his <u>Miranda</u>-warned rights. Based on our review of the judge's rationale and the record of the <u>Jackson v. Denno</u> hearing, we are not persuaded that Dr. Mash and Dr. Saint Martin's opinions about [Petitioner's] mental retardation or cognitive functioning would have swayed the judge to a different result. Hence there was no prejudice and counsel were not ineffective.

Smith, 245 P.3d at 1242.  Again, evaluating the OCCA's decision in light of Strickland and the deference afforded it by the AEDPA, the Court finds that Petitioner has not met the high standard required for relief.

In conclusion, the Court finds that Petitioner is not entitled to relief on Ground Three. While Petitioner has presented multiple challenges to the validity of his Miranda waiver, he has not shown that the decisions rendered by the OCCA with respect to this ground are contrary to or an unreasonable application of Supreme Court law.  In denying Petitioner relief on his Miranda-related claims, the OCCA and the state trial court relied heavily upon the videotape of Petitioner's confession, which is without question the best evidence to gauge the validity of Petitioner's Miranda waiver.  An examination of the videotape reveals that the assessments made of it by the trial judge and the OCCA are accurate and reasonable, as is the analysis flowing from it.  Under these circumstances, there is no persuasive argument that an "extreme malfunction[]" warranting habeas relief has occurred.  Richter, 131 S. Ct. at 786. Relief on Ground Three is therefore denied.

### D.     Ground Four:      Ineffective Assistance of Trial Counsel in the Investigation and Presentation of Mitigation Evidence.

In Ground Four, Petitioner alleges that his trial counsel were ineffective in the investigation and presentation of mitigation evidence.  Although Petitioner acknowledges that trial counsel presented relevant mitigation evidence, Petitioner faults his trial counsel for not presenting it effectively.  Petitioner additionally asserts that trial counsel should have done further investigation and presented evidence regarding his mental deficiencies,

including low intelligence, mental retardation, and organic brain damage. Petitioner presented this claim in both his first and second post-conviction applications. Both times, the OCCA addressed the claim on the merits and denied relief. Smith, 245 P.3d at 1242-43; Smith, No. PCD-2005-142, slip op. at 6-8. Petitioner argues that the OCCA's determinations are unreasonable and he takes issue with Respondent's assertion that under Richter relief should be denied.

In Richter, the Supreme Court addressed not only the limitations of the AEDPA, but how those limitations specifically apply to a claim of ineffective assistance of counsel that a state court has denied on the merits. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 131 S. Ct. at 786 (internal quotation marks and citation omitted). The Supreme Court bluntly acknowledged that "[i]f this standard is difficult to meet, that is because it was meant to be." Id.

> [The AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Id. (internal quotation marks and citation omitted). When these limits imposed by the AEDPA intersect with the deference afforded counsel under Strickland, a petitioner's ability to obtain federal habeas relief is even more limited.

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver

41

and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S. Ct. at 788 (internal quotation marks and citations omitted).

As noted above, the OCCA addressed the merits of Petitioner's Ground Four on two occasions. Each time, the OCCA applied Strickland and denied relief because Petitioner failed to show that he was prejudiced by any alleged deficiencies in trial counsel's representation. In its order denying Petitioner's first application for post-conviction relief, the OCCA held as follows:

[Petitioner] claims next that trial and appellate counsel were ineffective for failing to investigate and present mitigating evidence during the sentencing phase of trial. In support of this claim, [Petitioner] submits affidavits from his mother and eleven relatives. He also submits copies of his father's arrest history and copies of protective order documents filed by [Petitioner's] mother against [Petitioner's] father.

In total, these affidavits and documents establish a larger quantity of mitigating evidence than was presented at trial, but cover little new ground. The affidavits and accompanying materials show that [Petitioner's] father was an alcoholic, that he was abusive, and that [Petitioner] was a gang member. These materials also show that [Petitioner] grew up in a neighborhood known for gang activity, violence, and drug activity. This information, in one form or another, was developed at trial. New information from [Petitioner's] mother, who did testify at trial, to the effect that [Petitioner] was delivered by forceps, suffered a head injury as a small child by running into a table, and suffered a broken leg and "minor head injury" in a bicycle accident, seem to suggest that trial counsel was ineffective for failing to elicit this testimony as evidence of brain damage, low intelligence, or mental retardation. Other than offering his mother's recollections of these childhood injuries, [Petitioner] proffers no evidence that might have been developed by trial counsel and actually used to connect the alleged injuries to the present time (e.g., current medical diagnoses of brain damage, mental retardation, or impairment). Furthermore, unlike the other affiants, [Petitioner's] mother testified at trial, yet [Petitioner] offers no explanation or evidence as to why trial counsel's failure to elicit this information from her was not sound trial strategy.

Because much of the information contained in the proffered affidavits and other evidentiary materials had already been presented to the jury in some form, and because the slight bit of new information contained in these materials is tenuous at best, when the materials are viewed as a whole, we cannot say there was a reasonable probability that but for the lack of this information, the result of the sentencing proceeding would have been different. See Wood v. State, 2007 OK CR 17, ¶ 36, 158 P.3d 467, 479 (holding that to establish Strickland prejudice on ineffective assistance claim, petitioner must demonstrate reasonable probability that but for counsel's alleged error, outcome would have been different); Slaughter v. State, 2005 OK CR 6, ¶ 4, 108 P.3d 1052, 1054 (explaining that focus in capital post-conviction proceeding is on outcome determinative errors and factual innocence questions). Trial and appellate counsel's performance, therefore, did not deny [Petitioner] of his right to reasonably competent assistance of counsel under prevailing professional norms. See e.g., Murphy v. State, 2002 OK CR 32, ¶¶ 16-20, 54 P.3d 556, 564-65 (finding no ineffective assistance for failure to investigate and present mitigating evidence where post-conviction affidavits and other materials only provided more information about petitioner's life (e.g., violent father, violent neighborhood), but provided nothing new or so compelling as to convince Court there was reasonable probability of different

result), *overruled on other grounds by* <u>Blonner v. State</u>, 2006 OK CR 1, 127 P.3d 1135.

<u>Smith</u>, No. PCD-2005-142, slip op. at 6-8. In its order denying Petitioner's second post-conviction application, the OCCA held as follows:

> [Petitioner] claims that trial counsel were ineffective in presenting his mitigation case at sentencing for failing to provide his jury with expert evidence that he suffered from organic brain damage and low intelligence caused by long-term daily use of the drug phencyclidine (PCP). Specifically, [Petitioner] cites to Dr. Saint Martin's report in which he states that: (1) [Petitioner] suffers from a "brain insult" caused by substance abuse; and (2) long term use of PCP inhibits the brain's ability to learn new information; (Appl. at 35-36, citing Att. 7 at 12-13). [Petitioner] also refers to Dr. Mash's report in which she stated that: (1) tests on [Petitioner] indicated "non-specific brain damage affecting his attention, calculation, and short term memory [that] could be due to [Petitioner's] substance abuse"; and (2) [Petitioner's] chronic drug use contributed to "diffuse impairment of cognitive functioning" and "undoubtedly contributed to development of brain abnormalities" (Appl. at 36, citing Att. 4 at 3-5). [Petitioner] also cites to the April 4, 2003, report by Dr. Faust Bianco in which Dr. Bianco reported that [Petitioner] began smoking marijuana on a daily basis at age ten and started smoking PCP on a daily basis at age eleven.

> Assuming without deciding that counsel were deficient for failing to present this type of mitigating evidence at the sentencing stage, [Petitioner] cannot demonstrate a reasonable probability that the evidence would have affected the jury's weighing of the aggravating and mitigating evidence. Specifically, as other courts have observed, evidence of this sort has a "double-edged" quality. <u>Wackerly v. Workman</u>, 580 F.3d 1171, 1178 (10th Cir.2009). That is, a jury presented with evidence that the defendant is a chronic substance abuser might draw a negative inference from that evidence just as easily as it might find it mitigating. <u>See</u> <u>Davis v. Executive Dir. of Dep't of Corr.</u>, 100 F.3d 750, 763 (10th Cir.1996) (finding petitioner not prejudiced by counsel's failure to investigate and present expert testimony at sentencing on nature and effects of his severe alcoholism because whatever the mitigating effect of such evidence, it was equally possible that jury would have faulted petitioner for repeated failures to address problem). In the current case in particular, such evidence might bolster a conclusion that the defendant

represents a continuing threat to society, one of the aggravating circumstances charged in this case. Cf. Wackerly, 580 F.3d at 1178 (reviewing cases).

Given the uncertainty about how a jury might receive this type of evidence, we cannot find that [Petitioner] has demonstrated a reasonable probability that the jury would have reached a different sentencing result if it had been presented with evidence of [Petitioner's] chronic use of PCP and its allegedly attendant brain damage. [Petitioner's] counsel were not ineffective. See DeLozier v. Sirmons, 531 F.3d 1306, 1332 (10th Cir.2008) (finding that appellate counsel's decision not to argue that trial counsel was ineffective for failing to put on evidence of petitioner's substance abuse was not ineffective assistance because such evidence can be considered a "two-edged" sword), cert. denied, —— U.S. ——, 129 S.Ct. 2058, 173 L.Ed.2d 1138 (2009); Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir.2009) (finding that trial counsel's failure to present evidence of petitioner's substance abuse was not deficient in part because "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword'; while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence") cert. denied, —— U.S. ——, 130 S.Ct. 190, 175 L.Ed.2d 118 (2009); Jones v. Page, 76 F.3d 831, 846 (7th Cir.1996) (finding that counsel's failure to introduce evidence of petitioner's drug abuse was reasonable strategic choice because such evidence was "double-edged sword").

Smith, 245 P.3d at 1242-43.

Having reviewed these decisions by the OCCA, the Court simply cannot conclude that "all fairminded jurists would agree the [OCCA's] decision[s] [were] incorrect." Frost v. Pryor, 749 F.3d 1212, 1225-26 (10th Cir. 2014) ("Under the test, if *all* fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, *some* fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.") (emphasis added); Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013) (citing Richter, 131 S. Ct. at 786, for the proposition that relief is warranted "*only if all* 'fairminded

jurists' would agree that the state court got it wrong") (emphasis added). Petitioner's arguments are largely based on counsel's performance and how counsel could have done a better job if they would have just done something different. Petitioner appears to assert that if the prosecutor was able to conduct a thoughtful cross-examination of any mitigation witness, or use the testimony of any mitigation witness to argue a contrary point, then trial counsel was at fault. In addition, while faulting counsel for "placing a morass of facts before the jury without a unifying explanation or theme," Petition, p. 55, Petitioner additionally asserts that trial counsel should have thrown additional mitigation evidence into the mix. This is clearly not the Strickland standard, as Strickland explicitly cautions against "second-guess[ing]" and assessing counsel's actions through "the distorting effects of hindsight." Strickland, 466 U.S. at 689.

Moreover, beyond what counsel did or did not do, Strickland requires more. Strickland requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In denying Petitioner relief, the OCCA focused on Strickland's prejudice prong, which Strickland expressly permits. Id. at 697. Petitioner does not afford much argument to this component of Strickland except to say that if trial counsel had done more, then perhaps one juror would have voted against the death penalty. However, given Petitioner's gang affiliation and prior violent history, the evidence that he killed two innocent people in separate incidents on the same day, and that the murders were gang related, the odds that Petitioner would receive death verdicts were high. In the midst of these odds, trial counsel

presented a mitigation case which included not only expert evidence regarding gangs, but evidence which demonstrated that Petitioner was born and raised in an environment where the odds of life were stacked against him. Given these circumstances, the OCCA's determination that Petitioner's arguments failed to satisfy the prejudice element required by Strickland is reasonable. While Petitioner clearly disagrees with the OCCA's conclusion, he has not shown that he was the victim of an extreme malfunction in the criminal justice system about which all fairminded jurists would agree. Richter, 131 S. Ct. at 786. Relief on Ground Four is therefore denied.

### E.     Ground Five:     Jury Questions.

In Ground Five, Petitioner asserts that his constitutional rights were violated when the trial court, during first stage deliberations, responded to two[18] jury questions outside the presence of his counsel. Petitioner raised this claim on direct appeal and the OCCA denied relief. Smith, 157 P.3d at 1172-73. Petitioner raised the claim a second time in his second post-conviction application. The OCCA declined to reconsider its prior holding. Smith, 245 P.3d at 1243. The parties dispute how the federal aspects of this claim were presented to the OCCA. Petitioner contends that they were presented on direct appeal but overlooked by the OCCA. Accordingly, he contends that AEDPA deference does not apply and he seeks

---

[18] Although Petitioner asserts that the trial court's responses resulted in two separate violations of his constitutional rights, he acknowledges that the trial court's answer to the second question did not misstate the law and he gives scant discussion of it. Petition, p. 65.

de novo review of the claim.[19] Respondent, on the other hand, asserts that Petitioner's direct appeal claim focused on state law and particularly on the trial court's failure to comply with the requirements of Okla. Stat. tit. 22, § 894. Because Respondent asserts that the federal aspects of Petitioner's claim were not presented until his second post-conviction application, Respondent argues for the application of a procedural bar.[20] For the following reasons, the Court finds that Petitioner's Ground Five was presented to the OCCA on direct appeal, that the OCCA's merits determination is subject to AEDPA deference, and that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Relative to this claim, the record reflects that the jury began first stage deliberations at 1:23 p.m. (J. Tr. 12, 90). At 3:32 p.m., the jury sent out a question asking if there was a videotape of Marcus Berry and if they could view it. The trial court gave a written response of "No." (Court's Exhibit 7). At 6:01 p.m., the jury sent out a second question about its responsibilities in first stage deliberations. The trial court advised the jury to "assess punishment on all counts <u>except</u> if you find the defendant guilty of murder you will wait for the punishment stage on those 2 counts" (Court's Exhibit 8). The jury returned its first stage verdicts at 7:00 p.m. (J. Tr. 12, 90). After the jury was excused for the evening, an in camera hearing was held. At that time, the trial court advised the parties that they needed to make

---

[19] Alternatively, Petitioner argues that even if the AEDPA applies, he is still entitled to relief because the OCCA's decision is contrary to clearly established law and an unreasonable determination of the facts. Petition, pp. 66-67.

[20] Respondent presents argument on the merits as well. Response, pp. 68-72.

a record regarding State's Exhibit 133, the videotape of Mr. Berry's interview. The matter was discussed as follows:

> We need to make a record in regard to State's Exhibit Number 133 pursuant to an agreement that we made at the time, which was that the State would move to withdraw that exhibit and then we would substitute in as a Court's exhibit a redacted version and I would ask you to, Mr. Siderias and Mr. Deutsch [the prosecutors], to make such motions.

> MR. SIDERIAS:     Judge, at this time we would move to withdraw State's Exhibit Number 133. We provided the Court with, I think what's going to be marked as Court's Exhibit 9, a redacted version of that tape which includes those parts played to the jury. . . .

> THE COURT:     All right. Anything from you all in regard to the substitution on Court's Exhibit 9 as we previously introduced?

> MR. WOODYARD [defense counsel]:     No, Your Honor.

(J. Tr. 12, 95-96). Immediately thereafter, the trial judge advised the parties of the questions received from the jury and her answers to them. Regarding the content of the questions, the trial judge stated, "They were not questions that I even felt like I needed to consult with counsel about." Defense counsel made no comment or objection to the trial judge's announcement (J. Tr. 12, 96-97).

On direct appeal, Petitioner's claim centered around the trial court's failure to follow the procedure set forth in Okla. Stat. tit. 22, § 894. First and foremost, Petitioner challenged the trial court's failure to consult with his counsel prior to responding to the jury's questions. In connection therewith, Petitioner argued that the trial court "effectively den[ied] him his constitutional right to counsel and due process of law. U.S. Const. Amends. VI, XIV. . . ." Brief of Appellant, Case No. D-2003-1120, pp. 65-66. Petitioner also asserted that under

Wilson v. State, 534 P.2d 1325 (Okla. Crim. App. 1975), a violation of Section 894 results in a presumption that he was prejudiced; that the trial court answered the videotape question incorrectly; and that the trial court should have sent State's Exhibit 133 back to the jury room. Brief of Appellant, Case No. D-2003-1120, pp. 61-68.[21]

In denying Petitioner relief, the OCCA held as follows:

In his fifth proposition of error, [Petitioner] claims the trial court denied his Sixth Amendment right to counsel and his right to due process when the court answered two notes from the jury deliberating in the first stage without first consulting with counsel and then bringing the jury into open court to answer the questions. In the first note, the jury asked "Is there a video tape of Marcus Berry? If so can we view it?" The trial court responded "No." In the second note, the jury asked "Are we to assess punishment at [this] time or just guilt or innocence on every charge except the 2 murder charges?" The trial court answered the question as follows: "assess punishment on all counts *except* if you find the defendant guilty of murder you will wait for the punishment stage on those 2 counts."

In this proposition, [Petitioner] complains that his constitutional rights to counsel and due process were violated by the trial court's failure to communicate with the jury in open court as required by 22 O.S.2001, § 894. [FN13] The record shows that the trial judge did indeed answer the jury's questions by return note, without consulting counsel, and without bringing the jury back into court.

FN13. 22 O.S.2001, § 894 states: "After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called."

_____

[21] The Court notes that the brief submitted to the OCCA starts mid-argument with the header and introductory portion of the proposition noticeably absent.

When a communication between judge and jury occurs after a jury has retired for deliberations on a matter within the scope of § 894 and that communication does not comport with § 894's requirements, a presumption of prejudice arises. Wilson v. State, 1975 OK CR 71, ¶¶ 5–6, 534 P.2d 1325, 1327. The presumption "may be overcome if, on appeal, this Court is convinced that on the face of the record no prejudice to the defendant occurred." Id. Here, we agree with [Petitioner], that the district court erred by answering the jury's questions without notice to counsel. Nevertheless, because we find that [Petitioner] was not prejudiced by the error, reversal is not warranted.

With regard to the trial court's answer about assessing punishment, by instructing the jury that they must assess punishment on all counts unless they found [Petitioner] guilty on the murder counts, in which case they must wait for the punishment stage on those two counts, the trial court provided the jury with a correct statement of the law. We are unable to discern how [Petitioner] was prejudiced by the jury being instructed correctly on the applicable law. We therefore find no merit in this claim.

The trial court's answer to the jury's question concerning the videotaped interview of Marcus Berry, however, presents a more complicated problem. [Petitioner] contends not only that the trial court's one-word answer "No" was factually incorrect with regard to the existence of the tape, but that the judge erred by answering "No" to the jury's request to review the tape.

The videotape in question, State's Exhibit 133 (later changed to Court's Exhibit 9), was a recording of Marcus Berry's interview with detectives. In that interview, Berry recounted various incriminating statements made to him by [Petitioner]. Portions of the tape were played for the jury during the course of Berry's testimony.[FN14] It appears from the trial transcript, however, that sometime prior to the jury beginning its deliberations, the prosecution and defense agreed that the exhibit would be withdrawn. The transcript of the proceeding, after the jury returned its verdict in the guilt phase, memorializes that earlier agreement as follows:

> FN14. There is some confusion in the record as to whether the taped excerpts were used for impeachment or whether they were used to refresh Berry's memory. It appears from the context surrounding each instance, that the excerpts from the tape were used to refresh Berry's memory because each time an excerpt was played, it was in response to his claim not to remember what he told police about a specific matter

51

during the course of the taped interview. Nevertheless, because [Petitioner] asserts the videotape was used for impeachment and the State advanced the same assertion at oral argument, we assume for purposes of this appeal that the tape was used as impeachment evidence.

THE COURT: We need to make a record in regard to State's Exhibit Number 133 pursuant to an agreement that we made at the time, which was that the State would move to withdraw that exhibit and then we would substitute in as a Court's exhibit a redacted version and I would ask you to, Mr. Siderias and Mr. Deutsch, to make such motions.

MR. SIDERIAS [prosecutor]: Judge, at this time we would move to withdraw State's Exhibit Number 133. We provided the Court with, I think what's going to be marked as Court's Exhibit Number 9, a redacted version of that tape which includes those parts played for the jury. Also, I think we have marked as Court's Exhibit Number 1 the [Petitioner's] full confession unredacted.

. . .

THE COURT: All right. Anything from you all in regard to the substitution on Court's Exhibit Number 9 as we previously introduced?

MR. WOODYARD [defense counsel]: No, Your Honor.

(Tr. 12 at 95–96).

On the basis of this record, the trial court judge's decision not to consult counsel was correct because, as she understood it, counsel had already been consulted and the parties agreed the tape would be withheld from the jury. Any prejudice flowing from the jury's inability to review the tape, therefore, was the result of [Petitioner's] agreement that the tape be withdrawn. As such, the error cannot serve as the basis for reversal. See e.g., Ellis v. State, 1992 OK CR 45, ¶ 28, 867 P.2d 1289, 1299 (opinion on rehearing)(holding that error invited by defense counsel cannot serve as basis for reversal because defendant cannot invite error and then seek to profit from it); Pierce v. State, 1990 OK CR 7, ¶ 10, 786 P.2d 1255, 1259 ("[w]e have often recognized the well established principal that a defendant may not complain of error which he has invited, and that reversal cannot be predicated on such error").[FN15]

52

FN15. At oral argument, [Petitioner] elaborated on the alleged prejudice flowing from the exclusion of the tape by advancing the position that the tape was critical impeachment evidence and had Berry been discredited by it, the remainder of the State's case would have collapsed as insufficient for lack of corroborating evidence of [Petitioner's] confession, the only other evidence linking him to the Moore murder. We are not convinced [Petitioner] was prejudiced in this way, even if it is assumed the videotape was improperly withheld from the jury. Specifically, even if Berry's testimony is discounted in its entirety, [Petitioner] overlooks the testimony of Sheena Johnson. Johnson's testimony corroborated [Petitioner's] confession to police and provided the necessary linkage to the Moore murder. As noted above, Johnson testified that [Petitioner] told her that he went to Moore's apartment and killed her. He also demonstrated the manner in which he shot her, a manner consistent with the description he gave detectives during the confession interview. This testimony is sufficient to corroborate [Petitioner's] admissions to police that he committed the Moore murder. In light of Johnson's testimony, therefore, it is not possible to conclude that if the Berry videotape had been provided to jurors and had discredited Berry completely, the outcome of the trial would have been different. Because the outcome of the trial would have been unaffected, the error, if any, was harmless. Furthermore, the trial transcript shows that the State used the tape in open court to contradict statements by Berry that he could not remember certain incriminating admissions made to him by [Petitioner]. Thus, while the tape may have impeached Berry's credibility by contradicting his professed lack of memory about [Petitioner's] admissions, the portions of the tape that were played for the jury consisted of statements made by Berry to police in which he recounted statements made to him by [Petitioner] admitting to the murders. Under these circumstances, where the impeachment evidence against Berry also constituted damning substantive evidence against [Petitioner], it is difficult to see how [Petitioner] was prejudiced by the jury being denied the ability to replay the tape in the jury room.

Smith, 157 P.3d at 1172-73.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in

the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 131 S. Ct. at 784-85. <u>See also</u> <u>Johnson v. Williams</u>, 568 U.S. ___, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits. . . ."). As noted above, in his presentation of this claim to the OCCA, Petitioner cited to the United States Constitution and he asserted that his constitutional rights to counsel and due process were violated, and in its decision, the OCCA clearly acknowledged the federal aspects of Petitioner's claim. Under these circumstances, it is clear that the OCCA rendered an adjudication on the merits as required for AEDPA deference under Section 2254(d). It is without consequence that Petitioner did not more fully support and/or argue his federal claim in his direct appeal brief because it is clear that this potential failing did not prevent the OCCA from gleaning the federal aspects of Petitioner's claim. It is also without consequence that the OCCA did not elaborate on the federal aspects of Petitioner's claim in denying him relief because Section 2254(d) does not require a state court to "cite or even be aware of" the applicable Supreme Court authority. <u>Richter</u>, 131 S. Ct. at 784 (citing <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002)).

Although the "adjudicated on the merits" presumption is a strong one, it is subject to rebuttal. <u>Johnson</u>, 133 S. Ct. at 1096. As acknowledged in <u>Richter</u>, 131 S. Ct. at 785, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." In the present case, however, the circumstances do not question application of the presumption. In addition to the fact that the OCCA expressly

acknowledged Petitioner's federal constitutional claims in its decision, Petitioner's response to the decision is additionally relevant. Although Petitioner sought rehearing of the OCCA's decision, he did not challenge the disposition of this particular claim. In addition, when Petitioner subsequently asked the OCCA to reconsider the claim in his second post-conviction application, he did not assert that some portion of his claim had been overlooked. Instead, he expressly acknowledged that the claim had been raised and addressed on direct appeal. Smith, 245 P.3d at 1243. See Johnson, 133 S. Ct. at 1099 (finding it unlikely that the state court simply overlooked petitioner's federal claim because petitioner failed to file a petition for rehearing or otherwise allege in subsequent state and federal proceedings that a mistake had occurred).

Having determined that the OCCA adjudicated Petitioner's claim on the merits, AEDPA deference applies and Petitioner can only obtain relief if he shows that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, or an unreasonable determination of the facts. Beginning with Petitioner's contention that the OCCA unreasonably determined the facts, the Court finds that Petitioner has failed to make this showing. Petitioner takes issue with the OCCA's determination "that sometime prior to the jury beginning its deliberations, the prosecution and defense agreed that [State's Exhibit 133] would be withdrawn." Smith, 157 P.3d at 1172-73. Petitioner argues that the post-verdict recording of this agreement does not support a finding that the agreement was actually made pre-verdict. While Petitioner is correct that the pre-verdict record indicates that the original intention was that the videotape, or at least the portion of it that was played

for the jury, would be admitted as an exhibit, the post-verdict discussion supports the OCCA's finding that at some point a different agreement was reached. The OCCA's determination that a change was made before the jury began deliberating is supported by the failure of defense counsel to object to either the post-verdict record made or the trial court's response to the jury's question about the videotape. The Court has no doubt that had defense counsel believed that the exhibit should have gone back to the jury, he would have voiced his objections at that time.[22]

Petitioner makes three challenges to the OCCA's application of the law. He asserts that it is contrary to or an unreasonable application of United States v. Cronic, 466 U.S. 648 (1984), Shields v. United States, 273 U.S. 583 (1927), and Hicks v. Oklahoma, 447 U.S. 343 (1980). For the following reasons, the Court finds that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of these Supreme Court cases.

In Cronic, 466 U.S. at 658-59, the Supreme Court held that prejudice is presumed when an "accused is denied counsel at a critical stage of his trial." Asserting that jury deliberations are a critical stage, Petitioner contends that he was denied the effective assistance of counsel and that he is entitled to relief without any showing of prejudice

---

[22] The record reflects that while the State initially sought admission of State's Exhibit 133, defense counsel was against it from the start, or at least to "a carte blanc [sic] playing" of it (J. Tr. 5, 84). It can be assumed, therefore, that defense counsel was in favor of a subsequent agreement to make the videotape a court's exhibit as opposed to a jury exhibit. See Smith, 157 P.3d at 1173 n.15 (finding that the videotape "constituted damning substantive evidence against [Petitioner]").

because the trial court denied his counsel's presence when the questions came out from the jury during deliberations.

The threshold issue then is whether the trial court's interaction with the jury in this case constituted a critical stage. A critical stage denotes a point in a criminal proceeding which holds "significant consequences" for a defendant. Bell v. Cone, 535 U.S. 685, 696 (2002). It is a point "where counsel's absence might derogate from the accused's right to a fair trial." United States v. Wade, 388 U.S. 218, 226 (1967). The Supreme Court has not addressed the issue of whether jury deliberations constitute a critical stage, but this is not necessarily the end of the inquiry. As the Supreme Court recently noted,

> This is not to say that § 2254(d)(1) requires an "'identical factual pattern before a legal rule must be applied.'" Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case. Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). "[T]he difference between applying a rule and extending it is not always clear," but "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." Yarborough, supra, at 666, 124 S.Ct. 2140. The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded disagreement" on the question, Harrington, 562 U.S., at ——, 131 S.Ct., at 787.

White v. Woodall, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014).

Petitioner relies on cases from the Sixth and Seventh Circuits to support his assertion that jury deliberations constitute a critical stage. However, a review of these cases, as well

as others, demonstrate that there are circuit differences in the treatment of this issue.[23]  In the

first case cited by Petitioner, Siverson v. O'Leary, 764 F.2d 1208, 1214 (7th Cir. 1985), the

Seventh Circuit did find that jury deliberations are a critical stage; however, it ultimately

denied habeas relief by finding that the absence of counsel was harmless beyond a reasonable

doubt under Chapman v. California, 386 U.S. 18 (1967).  Siverson, 764 F.2d at 1217-19.  But

see Penson v. Ohio, 488 U.S. 75, 88 (1988) (acknowledging that Cronic error is not subject

to harmless error analysis); French v. Jones, 332 F.3d 430, 437-39 (6th Cir. 2003) (quoting

Penson and other Supreme Court authority for the proposition that Cronic error is never

harmless).

In French, the second case cited by Petitioner, the Sixth Circuit found that a defendant

was denied counsel in a critical stage when the trial court issued a supplemental jury

instruction to a deadlocked jury in the absence of his counsel.  Id. at 438.  While the Sixth

Circuit granted Cronic relief in that case, it has held that "not every statement to the jury goes

so far as to be a 'critical stage' instruction."  Peoples v. Lafler, 734 F.3d 503, 519 (6th Cir.

_____

[23] The Tenth Circuit has not specifically addressed this issue in the context of Cronic. In Smallwood, 191 F.3d at 1279, a habeas petitioner claimed that his Sixth, Eighth, and Fourteenth Amendment rights were violated when the trial judge had ex parte communications with the jury during sentencing deliberations.  Citing Rushen v. Spain, 464 U.S. 114, 117 (1983), the Tenth Circuit acknowledged that a defendant has a constitutional right to be present during critical stages of trial, but found no constitutional error where the jury's note was unanswered. Id. at 1279-80. In Esnault v. Colorado, 980 F.2d 1335, 1336-37 (10th Cir. 1992), the Tenth Circuit relied upon Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934), *overruled in part on other grounds by* Malloy v. Hogan, 378 U.S. 1 (1964), to find no constitutional error where the trial court conferred with defense counsel, but without petitioner being present, before answering a jury question.  See also Valdez v. Gunter, 988 F.2d 91, 92-94 (10th Cir. 1993) (citing Esnault and denying relief where petitioner was absent when an audio tape exhibit was replayed for the jury in response to a jury question submitted during deliberations).

2013).  In Peoples, the Sixth Circuit declined to grant habeas relief where the state appeals court found that the trial court's communication was "'administrative' and outside of the class of 'critical stage' jury instructions that subjects a defendant to prejudice if made without counsel."  Id.  The Sixth Circuit noted that "[g]iving a jury information it already has heard is not necessarily a critical stage."  Id. (citing Hudson v. Jones, 351 F.3d 212, 216 (6th Cir. 2003)).

Regarding this issue, the Third Circuit has acknowledged the "conflicting views among several courts of appeals as to whether mid-deliberation communication with the jury constitutes a critical stage under Cronic."  Smith v. Kerestes, 414 F. App'x 509, 511 (3rd Cir. 2011) (unpublished).  In Smith, the court discussed its prior holding in United States v. Toliver, 330 F.3d 607 (3rd Cir. 2003).  Id.  In Toliver, the Third Circuit did not apply Cronic, finding that the trial judge did not "'instruct'" the jury by providing "verbatim specifically excerpted record testimony that the jury itself had requested."  In reaching its conclusion, the court noted that the circumstances were unlike cases where a trial court, without consultation with defense counsel, "clarif[ied] the substantive elements of the charged offense (Curtis [v. Duval, 124 F.3d 1 (1st Cir. 1997)]) or instruct[ed] a deadlocked jury (French). . . ."  The court noted Cronic's applicability in those cases where the trial court "affirmatively guides jurors as to how they should fulfill their decisionmaking function."  Toliver, 330 F.3d at 614.

In Smith, the Third Circuit also noted that not every court has applied this distinction as to when Cronic applies.  Smith, 414 F. App'x at 511. For example, in Musladin v. Lamarque, 555 F.3d 830, 841 (9th Cir. 2009), the Ninth Circuit concluded that "*any*

communication to the jury during deliberations carries significant consequences."  In

Musladin, however, the Ninth Circuit was constrained by the AEDPA to deny relief.

Although under de novo review the court would have reached a different result, it could not

conclude that the state court acted unreasonably "in holding that a mid-deliberations

communication to the jury that does no more than refer the jury back to the original jury

instructions is not a 'critical stage' under Cronic."  Musladin, 555 F.3d at 842-43.  The Ninth

Circuit reasoned as follows:

> Although defense counsel plays a crucial role in formulating *any*
> mid-deliberation communication to the jury by the trial judge, where the judge
> simply directs the jury to his previous instructions, the potential impact of
> defense counsel's inability to participate is significantly lessened, because
> defense counsel played a role in the formulation of those instructions. In such
> circumstances, the jury receives only such information as was formulated with
> defense counsel's participation. Although we do not believe that defense
> counsel's prior participation is sufficient to render a mid-deliberation
> communication to the jury less 'critical' for purposes of the Cronic analysis,
> we cannot say that it would be unreasonable for a state court to so conclude.
> Accordingly, we are not free to hold that the state court's decision to require
> a demonstration of prejudice resulting from the denial of counsel here was
> objectively unreasonable.

Id. at 843 (footnote omitted).

In the absence of Supreme Court authority that jury deliberations constitute a critical

stage for purposes of Cronic, and because a survey of the circuits reveals no consensus on

the issue either, this is clearly an issue where fairminded jurists could disagree.  See White,

134 S. Ct. at 1707 (AEDPA relief is not available where "there are reasonable arguments on

both sides" of an issue).  In the present case, the trial court's denial of the jury's request to

view Mr. Berry's videotape was consistent with an agreement between the parties that it

would be admitted only as a court exhibit. Under these circumstances, it is not unreasonable for the OCCA to have found that Petitioner was not denied his right to counsel. Smith, 157 P.3d at 1173 ("On the basis of this record, the trial court judge's decision not to consult counsel was correct because, as she understood it, counsel had already been consulted and the parties agreed the tape would be withheld from the jury."). Such circumstances could lead reasonable jurists to conclude that it was not a critical stage where Cronic applies. Cronic, therefore, does not support Petitioner's claim for relief.[24]

Petitioner also asserts that the OCCA's decision is contrary to or an unreasonable application of Shields which he contends is factually indistinguishable and stands for the proposition that he and his counsel were entitled to be present for the trial court's re-instruction of the jury. Petition, pp. 70-72. In Shields, the parties requested that the trial court hold the jury in deliberation until a verdict could be reached. Shields, 273 U.S. at 584. During deliberations, the trial court interacted with the jury on more than one occasion without the defendant or his counsel. These interactions revealed "a marked difference in the views which the jury had as to the guilt of the various defendants." Ultimately, the jury found Shields guilty, but with a recommendation of mercy. Id. at 584-85, 588. The Supreme Court found that although the defense had agreed to allow the trial court to hold the jury in deliberation until a verdict could be reached, that agreement did not encompass the exclusion

---

[24] In a footnote to his Cronic argument, Petitioner makes an additional assertion that he was denied his right to be present personally when the trial court responded to the jury's questions. Petition, p. 69 n.14. Finding this footnote assertion to be a clearly inadequate presentation of a constitutional claim, the Court declines to address it.

of the defendant and/or his counsel where it was clear that the jury was struggling with the verdict. The Court found that the prior agreement "did not justify exception to the rule of orderly conduct of jury trial entitling the defendant, especially in a criminal case, to be present from the time the jury is impaneled until its discharge after rendering the verdict." Id. at 588-89.

Although Petitioner characterizes the Supreme Court's holding in Shields as a blanket rule warranting automatic relief whenever a defendant and/or his counsel are absent from any part of the jury trial proceedings, Petitioner's interpretation is much too broad, as demonstrated by subsequent Supreme Court authority. In Snyder, 291 U.S. at 105-06, the Supreme Court held that a defendant "has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." However, a due process violation occurs only when "a fair and just hearing would be thwarted by his absence," and there is no violation where a defendant's "presence would be useless, or the benefit but a shadow." Id. at 106-07, 108. In Rushen, 464 U.S. at 117, the Supreme Court held that harmless error applies to an *ex parte* communication between a trial judge and juror. Referencing Shields, the Court acknowledged that "[w]hen an *ex parte* communication relates to some aspect of the trial, the trial judge *generally should* disclose the communication to counsel for all parties." Rushen, 464 U.S. at 119 & n.4 (emphasis added). The Court additionally noted as follows:

Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. "At the same time and without detracting from the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered ... and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981); see also Rogers v. United States, 422 U.S. 35, 38–40, 95 S.Ct. 2091, 2094–2095, 45 L.Ed.2d 1 (1975). In this spirit, we have previously noted that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

Id. at 118-19 (footnotes omitted). See also United States v. Gagnon, 470 U.S. 522, 526-27 (1985) (discussing both Snyder and Rushen).

In addition, the facts in Shields are distinguishable from the present case. In Shields, the trial court interacted with the jury on more than one occasion without consulting defense counsel when it was clear that the jury was struggling with the issue of guilt. The trial court in effect nudged the jury to a guilty verdict. In these circumstances, it is clear that the absence of the defendant and/or his counsel was detrimental to the defendant. In Petitioner's case, the trial judge imparted no additional knowledge to the jury. The judge's responses to the jury's questions were legally correct and in accordance with the agreement of the parties.

With respect to State's Exhibit 133 in particular, because defense counsel had already been heard as to his position regarding the exhibit, it cannot be said that his absence (or Petitioner's absence for that matter) was detrimental to Petitioner. For these reasons, the Court finds that Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of <u>Shields</u>.

Petitioner's final argument is that the OCCA's decision is contrary to or an unreasonable application of <u>Hicks</u>. In <u>Hicks</u>, 447 U.S. at 346, the Supreme Court found a due process violation where the State arbitrarily denied a defendant his state law right to jury sentencing. To establish a due process violation occasioned by a state's failure to follow its own law, a habeas petitioner must show that the deprivation was "'arbitrary in the constitutional sense'; that is, it must shock the judicial conscience." <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1180 (10th Cir. 1999) (citation omitted). While it is clear that Petitioner is dissatisfied with the OCCA's treatment of his claim, Petitioner's arguments do not support a finding that the OCCA acted arbitrarily in its application of Okla. Stat. tit. 22, § 894 and <u>Wilson</u>, 534 P.2d at 1327.

In conclusion, for all of the reasons set forth above, Petitioner has failed to demonstrate his entitlement to relief. Ground Five is therefore denied.

**F.    Ground Six: <u>Batson</u>.**

In Ground Six, Petitioner alleges a violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Petitioner challenges the prosecution's use of a peremptory challenge to remove an African-American from the panel of alternate jurors. Petitioner raised this

claim on direct appeal. The OCCA addressed the merits of the claim and denied relief. As to be expected, the parties are at odds over whether the OCCA's decision is an unreasonable application of Batson.

Batson stands for the well-established principle that the prosecution cannot use a peremptory challenge to remove a potential juror "solely on account of their race." Batson, 476 U.S. at 89. In Batson, the Supreme Court set forth the standard to evaluate such claims.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citing Batson) (citations omitted). Regarding the second step, it is clear that the prosecution "must present a comprehensible reason"; however, the explanation given need not be either persuasive or plausible. "[S]o long as the reason is not inherently discriminatory, it suffices." Rice v. Collins, 546 U.S. 333, 338 (2006). In the final step, the trial court evaluates the prosecution's given explanation, and it is here "that the persuasiveness of the justification becomes relevant . . . ." Purkett v. Elem, 514 U.S. 765, 768 (1995). With the understanding "that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike[,]" it is here that the trial court "determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Id.

Because the trial court's decision is in essence an assessment of the prosecutor's credibility, it is a factual determination afforded great deference. Batson, 476 U.S. at 98 n.21. As noted in Hernandez,

> the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.

Hernandez, 500 U.S. at 365. In the habeas context, this deference is not only acknowledged but magnified by the provisions of the AEDPA. As a question of fact, both 28 U.S.C. § 2254(e)(1) and 28 U.S.C. § 2254(d)(2) are implicated. Thus, in order to prevail before this Court, Petitioner "must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, . . . and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (citation omitted).

In denying Petitioner relief, the OCCA held as follows:

> In his first assignment of error, [Petitioner] contends that the State's proffered race-neutral reasons for striking a potential alternate juror with a peremptory challenge was pretextual, and that the juror's excusal from the jury violated the Equal Protection Clause of the United States Constitution under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

> Batson establishes the following three part analysis: (1) the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race; (2) after the requisite showing is made, the burden shifts to the prosecutor to articulate a race-neutral reason related to the case for striking the juror in question; and (3) the trial court must then determine whether the defendant carried his burden of proving deliberate discrimination. 476 U.S. at 96–98, 106 S.Ct. at 1723–24, 90 L.Ed.2d at 87–88. As for the second requirement, the United States Supreme Court noted the

race-neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. Neill v. State, 1994 OK CR 69, ¶ 17, 896 P.2d 537, 546 (quoting Batson, 476 U.S. at 98, n. 20, 106 S.Ct. at 1723, n. 20, 90 L.Ed.2d at 88–89, n. 20). The trial court's findings as to discriminatory intent are entitled to great deference, id., and our review is for clear error only. Pennington v. State, 1995 OK CR 79, ¶ 29, 913 P.2d 1356, 1365. We review the record in the light most favorable to the trial court's ruling. Neill, 1994 OK CR 69, ¶ 17, 896 P.2d at 546.

The record here shows the prosecutor offered several explanations for striking the potential alternate juror. A neutral explanation in the context of this analysis means one based on something other than the race of the juror. Short v. State, 1999 OK CR 15, ¶ 13, 980 P.2d 1081, 1091. At this step in the inquiry, the issue is the facial validity of the prosecutor's explanation. Id. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason given is deemed race neutral. Id. (quoting Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (1991)); Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 839 (1995).

Here, the prosecutor used a peremptory challenge to excuse the venireman. In exercising the challenge, the prosecutor explained that:

> He [the juror] does not want to sit on this jury. His initial questions. We're also concerned about the tattoos on his neck. That's generally a commonplace where gang members do tattoos of their initials or letters. They are kind of done in sort of a calligraphy, which again is common among gang members. When the Court asked him questions about gang activity, even though the Court had done that not in the presence of rest of the jury, and we're also concerned with his age and his ability to sit on a case of this magnitude. Those are all reasons together that we have kicked or excused him.

(Tr. 3 at 167).

Over defense counsel's objection, the trial court judge explained that she had inquired of the juror concerning the tattoo prior to the prosecutor exercising his peremptory challenge, and noted that in her experience, people get tattoos for gang related reasons and many do not. The judge then explained:

I do believe that he [the juror] has stated that he would prefer not to be here. I do believe that that is a reason that is race-neutral because I think it's clear he would prefer not to be here and I think he has stated that. So, I don't believe that your striking him is for an illegal purpose or for the purpose of excluding, quote, unquote, 'minority' members of the jury.

(Tr. 3 at 167).

On the basis of this record, we agree with the trial court's finding that the prosecutor's explanation (the juror's expressed reluctance to sit) provided a facially valid reason that in itself does not reveal an intent to discriminate on the basis of race. We move now to the next stage of the <u>Batson</u> analysis.

Once a race-neutral explanation for the peremptory strike has been advanced, the opponent of the strike bears the burden of proving purposeful discrimination. <u>Batson</u>, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88–89; <u>Purkett</u>, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. A trial court's decision on the issue of discriminatory intent will not be overturned unless we are convinced the determination is clearly erroneous. <u>Short</u>, 1999 OK CR 15, ¶ 17, 980 P.2d at 1092. Here the trial court chose to believe the prosecutor's proffered race neutral explanation. There is no evidence in this record establishing that the prosecutor in this case had a history of purposeful discrimination against jurors on the basis of race or that race was even an issue in the case. No allegations were made that the commission of the offenses or [Petitioner's] prosecution for them were in any way racially or ethnically motivated. We find no error in the trial court's determination that [Petitioner] failed to carry his burden of showing purposeful discrimination.

[Petitioner] also raises two arguments that were not raised below in an attempt to demonstrate that the prosecutor's proffered justification for striking the juror was a pretext for purposeful racial discrimination. In the first, he claims the prosecutor's expressed concern about the juror's potentially gang-related tattoo was in itself evidence of an improper desire to exclude him based solely on race because, according to [Petitioner], gang membership is typically associated with minority races.[FN2] In the second, he claims that the prosecutor's proffered explanation was pretextual because the prosecutor did not strike two other potential alternate jurors who suggested that they preferred not to serve on the jury. We find neither argument persuasive.

FN2. [Petitioner] cites numerous extra-record sources to support his position that "common usage of the word 'gang' or term 'Crips' in Oklahoma County courtrooms is well-documented as applying overwhelmingly to African–American defendants." Even if we were to accept [Petitioner's] contention that peremptorily striking a juror for gang membership is the same as striking him for his race, the fact is, potential gang membership or sympathy was just one of several reasons offered by the prosecutor as a basis for the strike. Where a prosecutor offers a discriminatory explanation for a strike among a number of other permissible and plausible race-neutral reasons, and the trial court bases its decision on one of the race-neutral explanations, there is no Batson violation. Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 975–76, 163 L.Ed.2d 824 (2006). Here, the record reflects that in addition to gang concerns, the prosecutor also voiced concerns related to the potential juror's unwillingness to serve on the jury as well as his age. Disregarding the proffered gang rationale, the trial court judge clearly decided the issue on the basis of the race-neutral reason that the juror did not want to serve on the jury. Under the Rice rationale, therefore, even if the proffered gang reason was discriminatory, because the judge disregarded that reason and based her decision instead on one of the other race-neutral reasons, there is no Batson error here. Additionally, as noted, the prosecutor in this instance also explained that he was concerned about the juror's age and his resulting ability to sit on a case of this magnitude. In Rice, 126 S.Ct. at 975, the Supreme Court found that a prosecutor's concern about a juror's youth was a valid race-neutral explanation for a peremptory strike because "[i]t is not unreasonable to believe the prosecutor remained worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of controlled substance."

[Petitioner's] first argument misses the mark. The record indicates that the State intended to show that [Petitioner's] involvement in at least one of the murders was related to his gang activities and that gang-related matters would permeate the trial. The motive for the Pulluru murder in particular was linked to [Petitioner's] desire to seek revenge against a convenience store owner he believed made disparaging comments to the media about Teron "T–Nok" Armstrong, a fellow gang member who was killed during the course of the attempted robbery at Tran's Food Mart in 2000. Also, the prosecutor certainly knew before trial that the defense intended to call an expert witness to testify in the penalty phase of the trial about the history, sociology, and dynamics of

gangs in Oklahoma in an effort to provide mitigating evidence on [Petitioner's] behalf. With gang activity and gang-related matters at issue in this case, any concern the prosecutor showed in the possible gang involvement of a prospective juror was reasonable and race neutral.[FN3]

> FN3. Additionally, allowing a gang member to serve on a jury when another gang member is on trial for gang-related criminal activity could compromise the accused's right to a fair trial if the gang-member juror turned out to be a member of a rival gang, or was in sympathy with a rival gang. Moreover, allowing a gang member to participate in jury deliberations in a gang-related case could place the jurors themselves in jeopardy. Indeed, the jurors in this case expressed concerns about the possibility of gang reprisals against themselves (See District Court's Findings of Fact Re: Order Sealing Records at 4 (Supp. Rec. filed Sep. 10, 2004)). As a result, the trial court judge placed all juror identity information under seal. Under the circumstances, therefore, where the subject matter of the trial revolved around gang-related criminal activities, the prosecutor's concerns that a juror might have gang connections or sympathies were reasonable.

We are also unpersuaded by [Petitioner's] argument that the prosecutor's failure to strike two other potential alternate jurors who also suggested that they did not want to serve constituted evidence of a pretext. The fact that the prosecution failed to challenge other potential jurors who also said they did not want to sit does not erode the legitimacy of the race-neutral explanation for challenging one juror. Cf. Short, 1999 OK CR 15, ¶ 15, 980 P.2d at 1092 (holding that "[t]he fact that this reason, criminal records by family members, was not used in every instance in which it arose to excuse potential jurors, does not lessen its legitimacy as a race-neutral explanation"). Further, [Petitioner's] claim on this score is factually infirm. The record shows that contrary to [Petitioner's] suggestion, the two jurors did not express an unwillingness to serve on the jury, much less do it in the same blunt terms as the excused juror. Instead, the record of voir dire shows the responses of the other two jurors were equivocal. Saying that sitting on a jury in a capital case "is not an easy thing," or that being surprised at receiving a summons for jury duty, or that deciding between life without parole and death "would be hard choices to make" do not indicate an unwillingness to serve that is equivalent in any way to the sentiment expressed by the excused potential juror who said "I really don't want to be here." [FN4]

FN4. An earlier round of questioning during voir dire included this exchange between the prosecutor and the excused potential alternate juror:

> [Q.] Have you ever wanted to sit on a jury?
> [A.] No.
> [Q.] Still feel that way?
> [A.] Yeah.

[Petitioner] also asserts that exclusion of this minority juror undermined the reliability of his death sentence under the Eighth Amendment of the United States Constitution. [Petitioner] raises this claim in a single-sentence assertion. He makes no attempt at developed argument, cites no authority, and points to no portion of the record for factual support. The Eighth Amendment prohibits excessive bail, excessive fines, and imposition of cruel and unusual punishment. Because [Petitioner] offers no explanation of how exclusion of the potential juror violated this constitutional provision, his mere assertion is insufficient to demonstrate the existence of legal error, much less demonstrate that the alleged error had a substantial effect on the outcome of the trial or sentencing proceeding.

Smith, 157 P.3d at 1162-64.

Petitioner challenges the OCCA's decision on two grounds. First, Petitioner asserts that the OCCA, inconsistent with Batson, impermissibly placed a higher burden on him with respect to the prima facie showing. With a partial quotation of a sentence in the OCCA's opinion, Petitioner argues that the OCCA imposed upon him a requirement to prove that "the prosecutor in [his] case had a history of purposeful discrimination . . . ." Petitioner argues that Batson does not impose this standard and that it allows for a prima facie showing to be satisfied "based solely on the evidence concerning the State's use of peremptory challenges in his own case." Petition, p. 80 (citing Batson, 476 U.S. at 95). The problem with Petitioner's contention lies in his failure to fully quote the referenced sentence. What the OCCA stated was this: "There is no evidence in this record establishing that the prosecutor

in this case had a history of purposeful discrimination against jurors on the basis of race *or that race was even an issue in the case*." <u>Smith</u>, 157 P.3d at 1163 (emphasis added). In context, it is clear that the OCCA did not alter or misapply the <u>Batson</u> standard.

Second, Petitioner asserts that the OCCA did not properly apply <u>Batson's</u> third step. Here, Petitioner contends, as he did on direct appeal, that because there were other jurors who expressed a desire not to serve, the prosecutor's use of this reason to remove the <u>Batson</u>-challenged juror was pretextual.[25] On direct appeal, Petitioner supported his argument with reference to two jurors who were a part of the alternate selection process, Juror F, who ultimately served as one of the alternate jurors, and Juror M. Here, Petitioner adds an additional juror, Juror A, who actually sat on the jury.

Although Petitioner faults the OCCA for including a statement[26] which appears to downplay, if not disregard, the relevance of comparative juror analysis in assessing whether purposeful discrimination has occurred, the OCCA did not foreclose relief to Petitioner on this basis but ultimately analyzed and rejected Petitioner's comparisons as "factually infirm."

---

[25] As the OCCA noted, Petitioner did not present this argument to the trial court, but raised it for the first time on appeal. <u>Smith</u>, 157 P.3d at 1163.

[26] The statement to which Petitioner takes issue is as follows: "The fact that the prosecution failed to challenge other potential jurors who also said they did not want to sit does not erode the legitimacy of the race-neutral explanation for challenging one juror." <u>Smith</u>, 157 P.3d at 1164. While the Supreme Court has not mandated that comparative juror analysis be performed when conducting a <u>Batson</u> analysis, it has nevertheless found it to be a useful tool in determining whether purposeful discrimination has occurred. <u>See</u> <u>Murray v. Schriro</u>, 745 F.3d 984, 1005 (9th Cir. 2014) ("<u>Batson</u> and the cases that follow it do not require trial courts to conduct a comparative juror analysis. Rather, what <u>Miller–El [v. Dretke</u>, 545 U.S. 231 (2005),] established is that a comparative juror analysis is an important means for federal courts to review a trial court's ruling in a <u>Batson</u> challenge.").

Smith, 157 P.3d at 1164.  Reviewing the statements made by Juror F and Juror M, the OCCA

concluded that they "did not express an unwillingness to serve on the jury, much less do it

in the same blunt terms as the excused juror." Id.  The Court finds that Petitioner has failed

to show that this determination by the OCCA is "incorrect by clear and convincing evidence"

and that it is "'objectively unreasonable' in light of the record before the court." Miller-El,

537 U.S. at 348 (citation omitted).

In response to a question from the prosecutor about what Juror F thought about sitting

on the case, the following exchange took place:

> PROSPECTIVE JUROR F:  At first I was against it but as I sat back
> there and listened to it - -
>
> [PROSECUTOR]:   You were against sitting on a trial, you were
> against the death penalty, what?
>
> PROSPECTIVE JUROR F:  No, I wasn't against the death penalty.  I
> was just nervous to sit here.  I didn't mind back there but I was dreading it up
> here.
>
> [PROSECUTOR]:    Now that you're up here , what do you think?
>
> PROSPECTIVE JUROR F:   I'm getting a little easier.  It's not an easy
> thing, I guess, if you understand what I'm getting at.  I can't explain myself
> real good.

(J. Tr. 3, 154-55).  With Juror M, the prosecutor asked her if she had ever sat on a jury

before, to which she replied, "No."  The prosecutor followed up with a question as to how

she felt when she received her summons.  She responded, "I was surprised" (J. Tr. 3, 157).

In contrast, the Batson-challenged juror stated that he had never wanted to sit on a jury and

that he still felt that way, followed by a second comment of "I really don't want to be

here" (J. Tr. 3, 150, 157). This record supports the OCCA's determination that the comments by Juror F and Juror M were not "equivalent in any way to the sentiment expressed by the excused potential juror . . . ." <u>Smith</u>, 157 P.3d at 1164. Moreover, Petitioner's reference to the comments of a third juror, Juror A, does not undercut the OCCA's reasonable finding. Like Juror M, Juror A stated that he was surprised when he received his summons. Juror A further stated that while he had never really wanted to sit on a jury, "It's a new experience" (J. Tr. 1, 164). Like Juror F and Juror M, Juror A's comments are not of the same caliber as those expressed by the excused juror.

In conclusion, for the reasons set forth above, the Court finds that Petitioner has failed to demonstrate his entitlement to relief on this ground. Ground Six is therefore denied.

### G.     Ground Seven:       Joinder of Offenses.

In Ground Seven, Petitioner asserts that he was denied a fair trial by being tried for the crimes against Ms. Moore and Mr. Pulluru in a single trial. Petitioner raised this claim on direct appeal and was denied relief. Petitioner asserts that the OCCA's decision is an unreasonable application of federal law as well as an unreasonable determination of the facts. Respondent contends that much of Petitioner's claim is unexhausted; however, Respondent additionally asserts that Petitioner has failed to show that the OCCA's decision is an unreasonable determination of the facts or that it is contrary to or an unreasonable application of <u>United States v. Lane</u>, 474 U.S. 438 (1986), the applicable Supreme Court authority.

Initially, the issue of exhaustion must be addressed. Respondent contends that Petitioner did not raise any federal claim on direct appeal, but instead argued only a violation

of state law. Although much of Petitioner's claim on direct appeal was founded on Oklahoma statutes and case law, Petitioner asserted in his opening brief that he had been denied a fair trial, and through supplemental authority filed after oral argument, he cited federal case law in support of his claim. Petitioner's pleadings resulted in the OCCA acknowledging the federal claim, but finding that Petitioner had failed to demonstrate a "constitutional theory of misjoinder." Smith, 157 P.3d at 1168 n.7. Under these circumstances, the Court finds that the federal claim has been exhausted.[27]

Respondent additionally asserts that Petitioner has supported his habeas claim with new arguments which are not properly before the Court. On this point, the Court agrees. In Pinholster, 131 S. Ct. at 1398, the Supreme Court held that review under AEDPA is "limited to the record that was before the state court that adjudicated the claim on the merits." In support of his joinder claim, Petitioner has relied upon the affidavits of Ms. Johnson and Mr. Berry as well as others; however, this evidence was not presented to the OCCA at the

---

[27] The Court notes that Petitioner has presented his argument in accordance with the factors considered under Oklahoma law and as set forth by the OCCA in Glass v. State, 701 P.2d 765 (Okla. Crim. App. 1985). However, the Court is not considering Petitioner's state law claim because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See Webber v. Scott, 390 F.3d 1169, 1177 n.5 (10th Cir. 2004) ("To the extent [petitioner] is arguing that the joinder is improper under state law, such a claim is not a basis for federal habeas relief.") (citing Fox v. Ward, 200 F.3d 1286, 1292 (10th Cir.2000)).

time of Petitioner's direct appeal.[28]  Consequently, the Court will not consider this evidence in its determination of this claim.

In Lane, the Supreme Court acknowledged that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  Lane, 474 U.S. 438, 446 n.8 (1986).  See Cummings v. Sirmons, 506 F.3d 1211, 1239 (10th Cir. 2007) (quoting Lane and requiring a habeas petitioner to show the denial of a fundamentally fair trial in order to obtain relief for improper joinder); Lucero v. Kerby, 133 F.3d 1299, 1314 (10th Cir. 1998) (same).  "Such prejudice may arise when there is a great disparity in the amount of evidence supporting the charges or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the defendant."  Webber, 390 F.3d at 1178 (citing Lucero).

In his attack of the OCCA's opinion, Petitioner argues that the murders of Ms. Moore and Mr. Pulluru were separate and distinct crimes.  Although relying heavily on the affidavits of Ms. Johnson and Mr. Berry (which the Court is not considering, see fn.28, supra), Petitioner argues against the OCCA's finding that the murders were gang-related.  Petitioner additionally asserts that the murders were not geographically related, nor did they evidence

---

[28] The affidavits, which are included as attachments to the Petition (Attachments 10, 12, 24, and 32) were not even in existence at the time of Petitioner's direct appeal. The Court notes that although Petitioner also makes reference to Petition Attachment 16, the reference appears to be in error as it does not support the assertion made.  Petition, p. 89.  In any event, as it was also executed after Petitioner's direct appeal, it, too, is excluded from the Court's consideration.

a common scheme or plan. Finally, Petitioner asserts that evidence of both crimes[29] made it difficult for the jury to "sort out and separate the evidence relating to the separate crimes," and that it "allow[ed] the State to provide the illusion of a greater deal of proof, and proof of a higher quality, than would have been possible in separate trials." Petition, pp. 86, 89.

In denying Petitioner relief on this claim, the OCCA held in pertinent part as follows:

> In this instance, the two murders were properly joined. Evidence for each murder consisted of [Petitioner's] confession tape, the testimony of Detectives Sterling and McNutt, as well as the testimony of Marcus Berry and Sheena Johnson. The confession tape and witness testimony contained admissions and statements made by [Petitioner] during the course of conversations that simultaneously covered both murders. Trying each murder separately by presenting the same confession tape and witness testimony, therefore, would result in waste of judicial resources. Furthermore, because the tape and testimony contained admissions and statements made by [Petitioner] during the course of conversations that simultaneously covered both murders, wrenching the relevant admissions and statements from the context in which they were uttered would likely render the testimony unintelligible to a jury. Because the proof of each murder was inextricably intertwined with proof of the other, severance would have been impractical.

---

[29] Within this ground for relief, Petitioner also attacks the quality and substance of the presented evidence. In particular, Petitioner asserts that his confession is suspect and possibly false, that the shoe prints were "circumstantial at best," and that the forensic analysis of the bullets "went beyond the realm of science." Petition, pp. 86-88. The Court finds these arguments unpersuasive. Regarding his confession, Petitioner's challenge to its admission is addressed in Ground Three. Therein, the Court has found that the OCCA did not act unreasonably in determining its voluntariness and proper admission. With respect to the shoe prints, Petitioner simply states the obvious when he states that the shoe print evidence was circumstantial. Finally, regarding the testimony of firearms examiner Terrance Higgs, Petitioner has not shown that his testimony was invalid or patently unreliable. The record reflects that Mr. Higgs was a qualified expert in his field, whose opinion was only lightly challenged on cross-examination. Since the record reflects that the defense was permitted its own examination of the evidence (J. Tr. 9, 39), it can be assumed from the limited cross-examination of Mr. Higgs, as well the defense's failure to present their own expert, that the defense did not discover any significant holes in Mr. Higgs' opinion.

Furthermore, despite [Petitioner's] arguments that the two murders were unrelated, and therefore not properly joined, we are convinced that the proof related to each murder did overlap, and that it did so in such a way as to show a common scheme or plan. Specifically, the forensic evidence showed that at least one of the handguns used in the Moore murder was also used in the Pulluru murder. Additionally, [Petitioner's] admissions showed that in both instances he attempted to conceal his identity by eliminating fingerprint evidence at the scene (albeit in Moore's case he did so by wiping down the apartment and in Pulluru's case he did so by setting fire to portions of the convenience store where he touched things). Moreover, [Petitioner's] statements to police, to fellow gang member Marcus Berry, and to Sheena Johnson overlapped sufficiently to create a logical connection between the two murders. [Petitioner's] statements established the requisite nexus by tying both murders together as part of a common plan to take care of business that day by exacting revenge or retaliation against persons who had either wronged him directly or wronged him indirectly through his gang family.

In the case of the Moore murder, for example, [Petitioner] told Marcus Berry several days before the killings that Janet Moore's son was a "snitch" and that "snitches need to be dead." On the morning of the day following the killings, [Petitioner] told Berry that: (1) he had done something he had to do; (2) he had handled his business; and (3) he had gotten revenge on people who "crossed his family." In a separate conversation, [Petitioner] told Sheena Johnson "[t]hat bitch ass n* * * * * [Moore's son] sent the police to my house, my apartment" and that as a result, he had gone to Moore's apartment looking for the son. [Petitioner] told her that once he was in Moore's apartment, she started screaming so he shot and killed her.

The Pulluru murder was likewise shown to be part of [Petitioner's] plan to "take care of business" through retaliation. Evidence supporting this motive included the facts that [Petitioner] professed to have been very close to gang member Armstrong who was killed in the Tran's Food Mart robbery attempt. Specifically, [Petitioner] claimed to have brought Armstrong into the gang, paid his funeral expenses, and told Armstrong's mother that he would avenge Armstrong's death. Furthermore, [Petitioner] wore Armstrong's nickname "T–Nok" as a tattoo, and shouted "this is for my little homey that is dead" as he fired multiple shots into Pulluru.

Mr. Han Vo provided additional linkage between the 2000 robbery and the revenge-retaliation aspect of the Pulluru murder. Mr. Vo was the owner of Tran's Food Mart and was the victim of the attempted robbery in which

Armstrong was killed. Mr. Vo testified that his convenience store was located immediately adjacent to the store where Pulluru was killed. He testified further that on the Friday morning of the Pulluru homicide, he was in the district attorney's office preparing for the trial of the two surviving would-be robbers. By showing that the Pulluru murder occurred within yards of the location where Armstrong was killed, and that the Pulluru murder occurred within two days of the trial of the surviving robbers, Mr. Vo's testimony provided evidence supporting an inference that the Pulluru murder was part of a plan to exact revenge for the events surrounding Armstrong's gang-related death.

In summary, the evidence available to the district court judge at the time she ruled on [Petitioner's] joinder claims, and the development of that evidence at trial showed the Moore and Pulluru killings: (1) occurred within a relatively short period of time (i.e., one-and-a-half hours); (2) occurred in approximately the same location (i.e., south Oklahoma City); and (3) overlapped in such a way as to indicate a common scheme or plan (i.e., a plan to retaliate against persons [Petitioner] perceived to have wronged him or his gang or his fellow gang members). This evidence was sufficient to link the two murders together as a series of related criminal acts. The district court judge did not abuse her discretion in overruling [Petitioner's] objection to joinder or denying his motion for severance.

[Petitioner] also claims that combining two separately charged murders, one of which he contends was supported by weak or nonexistent evidence, resulted in prejudicial joinder sufficient to deny him a fair trial. [Petitioner] argues that joining the Moore case, which he characterizes as supported by weak or insufficient evidence, with the Pulluru case and its gruesome gang-related evidence, increased the likelihood that the jury would return a guilty verdict in both cases by: (1) relying on the proof of the stronger Pulluru murder to convict on the weaker Moore murder; or (2) inflaming the jury so much on evidence of the gang-related Pulluru murder that the jury reached a guilty verdict on the Moore murder on the basis of passion or prejudice.

Some courts have recognized that joinder of offenses in a single trial may be prejudicial if there is great disparity in the amount of evidence underlying the joined offenses.[FN7] Contrary to [Petitioner's] assertions, however, this is not one of those cases. In this claim, [Petitioner] focuses exclusively on the evidence of the Pulluru murder and argues that the weight of its evidence overpowered weak or nonexistent evidence in the Moore case. [Petitioner] ignores, however, the strong independent evidence supporting the Moore verdict. In particular, he gives no consideration to his videotaped

confession and ignores the fact the confession was well corroborated by admissions made separately to Sheena Johnson and Marcus Berry. The Moore murder was proved by separate and distinct evidence sufficient to support a guilty verdict. We find no merit to [Petitioner's] claim of prejudicial misjoinder based on disparities in the quanta of evidence.

> FN7. In a post-oral argument notice of supplemental authority, [Petitioner] calls our attention to two cases discussing this theory of misjoinder. Specifically, [Petitioner] refers us to Lucero v. Kerby, 133 F.3d 1299 (10th Cir.1998) and United States v. Foutz, 540 F.2d 733 (4th Cir.1976). To the extent these cases establish a cognizable constitutional theory of misjoinder, for the reasons set out in the main text, we find that [Petitioner] fails to show that he suffered this type of misjoinder.

> [Petitioner] also asserts that the jury reached its verdict in the Moore murder on the basis of passions inflamed by the egregious facts of the Pulluru murder, especially facts relating to his gang activities. [Petitioner] points to nothing in the record, however, indicating that the jury was unable to compartmentalize the evidence with regard to each count. Furthermore, [Petitioner's] jury was specifically instructed to give separate consideration to each offense as follows:

> EVIDENCE—SEPARATE CONSIDERATION FOR EACH OFFENSE

> You must give separate consideration for each offense. The defendant is entitled to have his case decided on the basis of the evidence and law which is applicable to each offense. **The fact that you return a verdict of guilty or not guilty on one offense** *should not, in any way, affect your verdict regarding any one of the other offenses.*

> (Instruction No. 6 (citing OUJI–CR 9–6))(emphasis added). [Petitioner] does not point to anything in the record tending to show that the jury failed to follow this instruction. With nothing but a bare allegation of prejudice, and in light of the fact that the jury was specifically instructed to give separate consideration to each offense, we cannot conclude that joinder of the Moore and Pulluru murders resulted in prejudice so great as to deny [Petitioner] a fair trial.

Smith, 157 P.3d at 1167-69 (heading omitted).

80

Despite Petitioner's arguments to the contrary, the Court finds that the OCCA's decision is a reasonable application of the law and a reasonable determination of the facts. While it may be inherently prejudicial to be tried in the same trial for two gang-related crimes, the "fault" for the joinder of offenses must fall on Petitioner, as it was he who connected what appeared to be too separate crimes by making admissions to third parties as well as to the police. Moreover, it is completely disingenuous for Petitioner to argue that the murders and attendant crimes were not gang related, when it was Petitioner himself, as a member of the Crips gang, who set out on February 22, 2002, with a mission to right wrongs he felt had been committed against him and his gang family. Under these circumstances, it simply cannot be said that "all 'fairminded jurists' would agree that the [OCCA] got it wrong." Lockett v. Trammel [sic], 711 F.3d 1218, 1231 (10th Cir. 2013) (quoting Richter). Relief on Ground Seven is therefore denied.

**H.** **Ground Eight:** **Ineffective Assistance of Trial and Appellate Counsel Relating to the Prosecution's Multiple References to Petitioner as "Hoover Killer."**

In Ground Eight, Petitioner asserts that he was denied the effective assistance of counsel at trial and on appeal with respect the prosecution's multiple references to him as "Hoover Killer" throughout both stages of trial. Petitioner faults his trial counsel for not making objections at trial and he faults his appellate counsel for not raising the claim on appeal. Petitioner raised this claim in his first application for post-conviction relief. Because one of Petitioner's trial lawyers also represented Petitioner on direct appeal, the OCCA did not apply a procedural bar to the claim, but instead addressed it on the merits. Petitioner

asserts that the OCCA's merits denial is contrary to federal law. In light of AEDPA deference and the deference afforded to Strickland claims, Respondent contends that Petitioner has failed to demonstrate his entitlement to relief.

In denying Petitioner's claim, the OCCA held as follows:

> [Petitioner] claims first that trial and appellate counsel were constitutionally ineffective for failing to object at trial or argue on appeal that the prosecutor committed misconduct by referring to him as "Hoover Killer" or "H.K." To obtain relief for ineffective assistance of trial or appellate counsel, a petitioner bears the burden of showing: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense by depriving him of a fair trial with a reasonable result. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 123 L.Ed.2d 674 (1984).

> Name-calling by a prosecutor is an unwarranted expression of personal opinion. Browning v. State, 2006 OK CR 8, ¶ 38, 134 P.3d 816, 839. Where the names are supported by the evidence, or the characterizations inherent in the names are reasonably inferred from the evidence, however, there is no error. See e.g., Browning, 2006 OK CR 8, ¶ 38, 134 P.3d at 839 (finding that prosecutor's references to defendant as cold-blooded killer and wolf in sheep's clothing were not error because they were reasonable inferences from the record); Malicoat v. State, 2000 OK CR 1, ¶ 32, 992 P.2d 383, 401 (finding no plain error in prosecutor's repeated use of terms monster and evil to describe defendant); Hammon v. State, 2000 OK CR 7, ¶¶ 56, 60, 999 P.2d 1082, 1095-96 (finding no error in prosecutor's reference to defendant as "Ruthless Richard" where name was one defendant used to describe himself as shown by signature on letter he wrote from jail).

> Evidence at trial showed that [Petitioner] identified himself as "Hoover Killer" and adopted that name as part of his street persona. During his interview with detectives, for example, [Petitioner] admitted that he used the nickname and proudly displayed a tattoo consisting of the initials "H.K." Additionally, [Petitioner's] roommate testified that he knew [Petitioner] by the names "Hoover Killer" and "H.K.," and [Petitioner's] female confidant, to whom he admitted details of the homicide, knew him only by these nicknames. Because there is evidence that [Petitioner] chose the names for himself, and because there is evidence supporting his use of the names, there was no error

in the prosecutor's use of the names when referring to him. Consequently, had trial counsel objected to use of the names, or had appellate counsel raised the issue on direct appeal, the objection or claim would have been denied.[FN1] Neither trial nor appellate counsel were ineffective for failing to raise a meritless issue. Pavatt v. State, 2007 OK CR 19, ¶ 66, 159 P.3d 272, 292.

> [FN1] This Court rejected [Petitioner's] nearly identical claim in his appeal of an unrelated second-degree murder conviction. In Smith v. State, No. F-2004-290, Op. at 17 (Jun. 29, 2006) (not for publication), this Court found that the prosecutor's use of the name "Hoover Killer" was not error where the nickname was chosen voluntarily by [Petitioner], and the use of the name, when viewed in context, did not appear excessive or in bad faith.

> Furthermore, on this record, we fail to see how [Petitioner] was prejudiced, even if the prosecutor's use of the nickname is assumed to be error. Specifically, we are not convinced that had the prosecutor simply referred to [Petitioner] by his birth name rather than his nickname, the jury would have overlooked the otherwise very strong evidence of guilt (e.g., videotaped confession to police and incriminating statements to third parties), or overlooked the strong evidence supporting the death penalty aggravating factors. See Strickland, 466 U.S. at 691, 104 S.Ct. at 2067 ("[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment").

Smith, No. PCD-2005-142, slip op. at 3-5. Because the OCCA addressed Petitioner's claim on the merits, applied Strickland, and denied Petitioner relief in a well-reasoned opinion, Petitioner's ability to obtain relief is significantly minimized. See Ground Four, supra (discussing Richter and the high deference afforded Strickland claims under the AEDPA).

In support of his argument that the OCCA's decision is contrary to federal law, Petitioner addresses the propriety of the underlying prosecutorial misconduct claim, asserting that the OCCA unreasonably determined that it was a meritless issue. Petitioner references two Supreme Court cases, Donnelly v. DeChristoforo, 416 U.S. 637 (1974), and Dawson v.

Delaware, 503 U.S. 159 (1992). In Donnelly, the Supreme Court set forth the standard for assessing claims of prosecutorial misconduct. Generally, it is a due process test, i.e., whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. However, "[w]hen specific guarantees of the Bill of Rights are involved, . . . special care [is taken] to assure that prosecutorial conduct in no way impermissibly infringes them." Id. Petitioner then relies on Dawson to support his claim that the prosecution infringed a specific right, namely his First Amendment freedom of association, when they referred to him by a gang-related name. Dawson, 503 U.S. at 163 (acknowledging "that the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs").

Respondent is correct that Petitioner did not argue to the OCCA that his First Amendment right of association was infringed. See Original Application for Post Conviction Relief, Case No. PCD-2005-142, pp. 21-24. Nevertheless, it is clear that this argument lacks merit. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In Dawson, the Supreme Court found that admission of evidence that the defendant was a member of the Aryan Brotherhood was prohibited by the First and Fourteenth Amendments. Dawson, 503 U.S. at 160. However, the Dawson Court did not find that this type of evidence was completely inadmissible, and it specifically held "that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and

associations are protected by the First Amendment." Id. at 165. The distinguishing factor in Dawson was that the Aryan Brotherhood evidence had "no bearing on the issue being tried," and was therefore irrelevant. Id. at 160, 168. Such is not the case here, where there is no question that the murders committed by Petitioner were gang related. By his own admission, Petitioner's actions were motivated by revenge and retaliation for wrongs committed against him or his gang family. Smith, 157 P.3d at 1167 ("[Petitioner's] statements established the requisite nexus by tying both murders together as part of a common plan to take care of business that day by exacting revenge or retaliation against persons who had either wronged him directly or wronged him indirectly through his gang family."). Because Petitioner's association with the Crips gang was intertwined with the commission of his crimes, it is clear that the prosecution's references to Petitioner's gang name did not deny Petitioner's First Amendment rights. See Smith, No. PCD-2005-142, slip op. at 5 ("Because there is evidence that [Petitioner] chose the names for himself, and because there is evidence supporting his use of the names, there was no error in the prosecutor's use of the names when referring to him.").

Petitioner additionally takes issue with the OCCA's prejudice determination, which included the OCCA's assessment that the evidence supporting Petitioner's convictions and death sentences was strong. Id. With reference to his first ground for relief, Petitioner argues that the evidence against him was not as strong as the OCCA found. Respondent asserts that this argument is unexhausted as well; however, the Court disagrees. This allegation is not a new claim, but an appropriate argument directed at the reasonableness of

the OCCA's holding. Nevertheless, it is unavailing. In addition to finding that Petitioner is not entitled to relief on his Ground One, the Court additionally concurs with the OCCA's assessment of the evidence. The evidence against Petitioner was in fact strong, particularly in light of his confession and open acknowledgment of his gang involvement.

In summary, for the reasons set forth above, the Court finds that Petitioner is not entitled to relief on Ground Eight. Because Petitioner has not shown that the OCCA acted unreasonably in the determination of his claim, his Ground Eight is hereby denied.

### I.    Ground Nine:    Jury's Weighing of Aggravating and Mitigating Circumstances.

In Ground Nine, Petitioner asserts that <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), requires Oklahoma capital juries to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Petitioner presented this claim to the OCCA on direct appeal. Having repeatedly rejected similar claims, the OCCA denied Petitioner relief. <u>Smith</u>, 157 P.3d at 1179. Although Petitioner reasserts the claim here, he acknowledges the Tenth Circuit's decision in <u>Matthews v. Workman</u>, 577 F.3d 1175, 1195 (10th Cir. 2009), which is consistent with OCCA precedent. In light of <u>Matthews</u>, as well as the Tenth Circuit's recent decision in <u>Lockett</u>, 711 F.3d at 1252-55,[30] the Court finds that Petitioner has

---

[30] All of Oklahoma's federal district courts have similarly held. <u>Fitzgerald v. Trammell</u>, No. 03-CV-531-GKF-TLW, 2013 WL 5537387, at *59 (N.D. Okla. Oct. 7, 2013); <u>Jackson v. Workman</u>, No. 08-CV-204-JHP-FHM, 2013 WL 4521143, at *27 (N.D. Okla. Aug. 26, 2013); <u>Cole v. Workman</u>, No. 08-CV-328-CVE-PJC, 2011 WL 3862143, at *51-52 (N.D. Okla. Sept. 1, 2011); <u>Dodd v. Workman</u>, No. CIV-06-140-D, 2011 WL 3299101, at *55-57 (W.D. Okla. Aug. 2, 2011), *overruled on other grounds by* <u>Dodd v. Trammell</u>, 753 F.3d 971 (10th Cir. 2013); <u>Primeaux v. Workman</u>, No. CIV-05-224-C, 2010 WL 3942395, at *32-33 (W.D. Okla. Oct. 7, 2010); <u>DeRosa v. Workman</u>, No. CIV-05-213-JHP, 2010 WL 3894065, at *32-33 (E.D. Okla. Sept.

failed to demonstrate his entitlement to relief. Based on the rationale set forth in <u>Matthews</u> and <u>Lockett</u>, Petitioner has not shown that the OCCA's denial of his claim is contrary to or an unreasonable application of <u>Ring</u>. Ground Nine is therefore denied.

### J.      Ground Ten:      Cumulative Error.

In his final ground, Petitioner asserts that he is entitled to relief upon a claim of cumulative error. Petitioner unsuccessfully raised a cumulative error claim to the OCCA on direct appeal and in both of his applications for post-conviction relief. Respondent's initial contention is that the absence of Supreme Court authority on the viability of a claim of cumulative error prevents relief. However, Respondent additionally asserts that Petitioner's claim must be denied because the OCCA reasonably denied relief.

Without addressing Respondent's initial contention, the Court finds that Petitioner is simply not entitled to relief on a cumulative error theory. In the state court review of Petitioner's convictions, the OCCA found only one error and that was due to the trial court's failure to comply with the procedural requirements of a state statute. <u>Smith</u>, 157 P.3d at 1172 (finding that the trial court erred by responding to jury notes without notice to defense counsel). With only one error (which the OCCA ultimately determined was harmless), the OCCA's conclusion on direct appeal, and thereafter in post-conviction review, was that because there was only one error, there could be no cumulative error claim. <u>Smith</u>, 245 P.3d at 1243; <u>Smith</u>, No. PCD-2005-142, slip op. at 8; <u>Smith</u>, 157 P.3d at 1179. Because the

---

27, 2010); <u>Murphy v. Sirmons</u>, 497 F.Supp.2d 1257, 1277-78 (E.D. Okla. 2007).

OCCA correctly found that a single error will not support a claim for cumulative error, and because this Court has found no additional errors in its review of Petitioner's grounds for relief, Petitioner's Ground Ten is hereby denied. See Hooks, 689 F.3d at 1195 (cumulative error analysis is required "only if there are at least two errors").

## V.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition (Doc. 28) and motion for an evidentiary hearing (Doc. 35) are hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 16th  day of September, 2014.


_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE